# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:16-cr-00033-JD |
| | ) | |
| DANIEL MUSSO, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

JOHN FARLEY
Acting United States Attorney

Matthew T. Hunter
Special Assistant U.S. Attorney

John S. Davis
Assistant U.S. Attorney

53 Pleasant Street, 4th Floor
Concord, New Hampshire 03301
(603) 225-1552
Matthew.Hunter@usdoj.gov

Dated: February 9, 2018                    John.Davis8@usdoj.gov

## TABLE OF CONTENTS

I.    Background and Legal Standard. ................................................................... 1

II.   The Grenades Are National Firearms Act ("NFA") Firearms That Must
      Be Registered. .......................................................................................... 4

      a.   The M67 Grenades In This Case Are "Explosive Grenades" Under A
           Plain Reading Of The NFA Because They Are Objectively Identifiable
           Military Munitions That Contain Explosives And The NFA Does Not
           Require That They Be Operable. ..........................................................5

      b.   The M67 Grenades In This Case Are "Explosive Grenades" Because
           They Were Designed To Be Weapons And Are "Capable Of Exploding." ..................11

III.  The Defendant's Claims of "Illegal Activity" and "Outrageous Misconduct"
      in the FBI's Handling of the Grenades Are Meritless. ................................... 18

IV.   Conclusion. ............................................................................................. 23

On January 27, 2016, the defendant, Daniel Musso, received four military-issued M67 fragmentation grenades (with inoperable M213 fuzes) that each contained 6.5 ounces of Composition B high explosives, and was subsequently charged with firearms and explosives offenses.   The defendant has filed a Motion to Dismiss all of these charges (the "Motion").[1] The Motion and accompanying memorandum largely rely on disputed facts and fail to allege a basis for dismissal under Federal Rule of Criminal Procedure 12(b).   Moreover, although it is undisputed that the military-issued M67 fragmentation grenades in this case had inoperable fuzes, such grenades are "destructive devices" under 26 U.S.C. § 5845(f) and therefore are "firearms" regulated under the National Firearms Act ("NFA"), because they are capable of exploding by other means and therefore are "explosive . . . grenades" under § 5845(f)(1)(B) that were "designed" as weapons and never "redesigned" for use in a non-military context.   For these reasons, and the reasons below, the Government respectfully requests that the Court deny defendant's Motion.

## I.     Background and Legal Standard.

The Superseding Indictment contains five charges, all of which arise from an FBI undercover sale of grenades to the defendant on January 27, 2016.   Counts One through Four each allege that the defendant knowingly received and possessed an unregistered firearm in violation of 26 U.S.C. § 5861(d).   Namely, a grenade, which is a firearm as defined in 26 U.S.C.

---

[1] The Motion (Dkt. No. 72) is far narrower in scope than the supporting memorandum (Dkt. No. 73), in that the former pleading raises only the issues of (1) the presence of an apparently back-dated chain of custody form; and (2) the fact that the defendant consented to multiple searches but the government did not find inculpatory evidence.   Neither of those issues is a cognizable ground for dismissal under Fed. R. Crim. P. 12.   By contrast, the defendant's supporting memorandum is 91 pages long, plus exhibits, references a vast compendium of federal laws, rules and regulations, and accuses the government of "shocking violations."   Def. Mem. at 91.   In the instant pleading, without conceding that the defendant's Motion is formally sufficient, the government will assume for argument's sake that all issues presented in the defendant's supporting memorandum are also raised in his Motion.

§§ 5845(a)(8), (f)(1)(B).   Count Five alleges that the defendant, who was not a licensee or permittee, knowingly received approximately 26 ounces of high explosive materials contained inside the four hand grenades, known as Composition B explosive.   The defendant seeks dismissal of all five counts.

"[W]hen 'a defendant seeks dismissal of the indictment, the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense.'" *United States v. Stepanets*, 879 F.3d 367, 372 (1st Cir. 2018) (quoting *United States v. Savarese*, 686 F.3d 1, 7 (1st Cir. 2012)).   "[I]n seeing whether an indictment is up to snuff, a court must reject arguments that embrace technical niceties at the expense of common sense."   *Id.* (citing *United States v. Mubayyid*, 658 F.3d 35, 69-70 (1st Cir. 2011)).   In addition, the Court "must deny a motion to dismiss" to the extent it relies on disputed facts.   *Id.* (citing *United States v. Covington*, 395 U.S. 57, 60 (1969)).

The bulk of the defendant's prolix Motion disputes the adequacy of the chain of custody for the grenades based on unsubstantiated and meritless allegations of government misconduct. This is a factual dispute that cannot be resolved in a Rule 12 motion.   *Id.*; *see also* Declaration of Brian LeBlanc ("LeBlanc Decl.") accompanying this Memorandum; *cf. United States v. Barrow*, 448 F.3d 37, 42–43 (1st Cir. 2006) (describing witness trial testimony that established chain of custody).   In any event, even if true, the defendant's allegations fall well below the "demanding standard permitting dismissal of all criminal charges" based on government misconduct.   *United States v. Therrien*, 847 F.3d 9, 14 (1st Cir. 2017) (dismissal permitted "only in those very rare instances when the government's misconduct is so appalling and egregious as

2

to violate due process by 'shocking . . . the universal sense of justice.'" (citation omitted)).   And, any "possible defect in the chain of custody for a certain piece of evidence factors into the weight given to the evidence rather than its admissibility."   *United States v. Reid*, No. CRIM 05-CR-057JD, 2006 WL 889555, at *2 (D.N.H. Mar. 28, 2006), DiClerico, J. (citing *United States v. Scharon*, 187 F.3d 17, 22 (1st Cir.1999)).

However, the government agrees that the defendant's argument that live M67 grenades with inoperable fuzes are not destructive devices as defined by 26 U.S.C. § 5845[2] can and should be resolved by pretrial motion.   *See* Fed. R. Crim. P. 12(b)(3).   The defendant's challenge relies on the following undisputed facts:   (i) the FBI purchased the M67 grenades in this case from the Marine Corps in Quantico, Virginia;[3] (ii) these M67 grenades were manufactured to be used by the Marine Corps;[4] (iii) each grenade contained 6.5 ounces of Composition B high explosive and is thus capable of exploding—*e.g.*, by means of a commercial detonator;[5] and (iv) the M213 fuzes in the grenades were replaced with inoperable M213 fuzes so that the grenades would not explode in the usual way, by pulling the pin on the fuze.[6]   The

---

[2] Defendant's Memorandum in Support of his Motion to Dismiss (Dkt. No. 73; hereinafter, "Def. Mem."), at 6-11.

[3] *Id.* at 1-2 & n.1, 11-12.

[4] *Id.* at 1-2 & n.1, 11-12.

[5] *Id.* at 1 n.1, 2, 7, 62.

[6] *Id.* at 1 n.1, 5-7, 62.   The defendant characterizes FBI Explosive and Hazardous Device Examiner Travis McCrady's legal opinion that "the items"—*i.e.*, the live M67 grenades with inoperable M213 fuzes—"are not destructive devices" as a "concession" by the government "that the alleged grenades are not destructive devices as charged . . . ."   Def. Mem. at 6-7.   To the contrary, for the reasons discussed in this Memorandum, Mr. McCrady's legal conclusion is based on an application of the wrong legal standard and misunderstanding of the applicable law.   Regardless, "questions of law are not 'to be decided by the trier of fact'; rather it is for the judge, not the lawyers or the witnesses, to inform the jury of the law applicable in the case . . . ."   *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997).   Thus, Mr. McCrady's (mistaken) legal conclusion is inadmissible.   *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert

Court should consider these undisputed facts when resolving this issue.   *See United States v. Weaver*, 659 F.3d 353, 355, n.* (4th Cir. 2011) ("As circuit courts have almost uniformly concluded, a district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts." (citing cases)).[7]

## II.   The Grenades Are National Firearms Act ("NFA") Firearms That Must Be Registered.[8]

The National Firearms Act makes it unlawful to receive or possess an unregistered "firearm."   26 U.S.C. §§ 5861(d).   The term "firearm" includes a "destructive device."   26

---

testimony that expresses a legal conclusion."); *U.S. v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011) ("[I]t does not help the jury for an expert to give testimony that 'states a legal standard or draws a legal conclusion by applying law to the facts.'"); Fed. R. Evid. 702(a) (expert opinion must help the trier of fact).

[7] Recently, in *United States v. McLarnon*, 1:15-cr-00212-SM, Judge McAuliffe granted a Rule 29 motion to dismiss two counts brought under 26 U.S.C. § 5861(d) that charged the defendant with receiving unregistered grenades that, as in this case, contained high explosives and had inoperable fuzes.   Judge McAuliffe reasoned that, although they contained explosives, because the grenades could not be made to explode using the inoperable fuze, they were not explosive grenades as defined in 26 U.S.C. § 5845 (f)(1)(B).

Other circuits have rejected this definition of "destructive device."   *See, e.g.*, *U.S. v. Sheehan*, 838 F.3d 109, 119 (2d Cir. 2016) (device "is an 'explosive bomb' within the meaning of [26 U.S.C. § 5845(f)(1)(A)]" despite having an inoperable fuze and is thus "incapable of detonating in its ordinary or intended manner" because it is "capable of detonating" by other means).   However, the First Circuit has not squarely addressed the issue.   Due to the lack of First Circuit guidance and because this issue is important for ongoing and future law enforcement operations, the government requests that, when deciding this Motion, the Court consider the undisputed facts.   The defendant, of course, can later challenge these facts at trial and can appeal if the Court denies his Motion.   However, if the Court considers these undisputed facts and dismisses Counts One through Four pretrial, the government would be able to appeal the issue to the First Circuit and thereby obtain guidance from the Circuit that will inform future law enforcement operations.   *Cf. Weaver*, 659 F.3d at 355-56.

[8] The question of whether a particular item constitutes a "firearm" under 26 U.S.C. § 5845 is a mixed question of law and fact to be determined by the jury.   *U.S. v. Yannott*, 42 F.3d 999, 1005 (6th Cir. 1994) ("While the determination of what constitutes a firearm under the relevant statute is a question of law, the determination of whether a particular weapon fits within the legal definition of a firearm under that statute is a question of fact."); *see also U.S. v. Johnson*, 152 F.3d 618, 624, 626 (7th Cir. 1998) (noting that issue of weapon's "design" is question of fact for jury).

4

U.S.C. § 5845(a)(8).   Subsection 5845(f), in turn, describes three separate categories of destructive devices:   (i) weapons that are objectively identifiable and particularly destructive military munitions, including: "any explosive, incendiary, or poison gas . . . grenade . . . [or] similar device," § (f)(1)(B), (F); (ii) bazooka-type weapons that "expel a projectile by the action of an explosive or other propellant" and have "a bore of more than one-half inch in diameter," § (f)(2); and (iii) "any combination of parts either designed or intended for use in converting any device into a destructive device" as previously defined and "from which a destructive device may be readily assembled," § (f)(3).

Further, the term "destructive device" does not include:

- "any device which is neither designed nor redesigned for use as a weapon";

- "any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device";

- "surplus ordnance sold, loaned, or given" by the Army pursuant to certain federal laws; or

- "any other device which the [ATF Director] finds is not likely to be used as a weapon, or is an antique or is a rifle which the owner intends to use solely for sporting purposes."

26 U.S.C. § 5845(f); *see also* 27 C.F.R. § 479.11(a) (same definition of destructive device).

    a.  <u>The M67 Grenades In This Case Are "Explosive Grenades" Under A Plain Reading Of The NFA Because They Are Objectively Identifiable Military Munitions That Contain Explosives And The NFA Does Not Require That They Be Operable.</u>

Beginning with § 5845's text, the devices in question are objectively identifiable as "explosive grenades," since they are paradigmatic (albeit altered for safety reasons) examples of hand grenades in use by the United States military.   Grenades are part of a category of "major destructive devices such as bombs, grenades, mines, rockets, and [certain] large caliber

weapons" listed in subsections (f)(1) and (2).   *United States v. Freed*, 401 U.S. 601, 616 (1971)

(Brennan, J., concurring); *see also United States v. Posnjak*, 457 F.2d 1110, 1115-16 (2d Cir.

1972) (same).   Importantly, unlike other parts of § 5845, the weapons in subsection (f)(1), such

as "explosive grenade," do not include a "test of objective capability."   *See United States v.*

*Crooker*, 608 F.3d 94, 98 (1st Cir. 2010) (explaining that machine gun definition, in contrast to

"silencer" definition, is based on a particular weapon's objective capability).   For example, a

"machinegun" means a weapon "which shoots, is designed to shoot, or can be readily restored to

shoot" automatically by a single trigger pull, 26 U.S.C. § 5845(b); a bazooka or other large-bore

destructive device must be one that "will, or which may be readily converted to, expel a

projectile by the action of an explosive or other propellant," *id.* § 5845(f)(2); and the phrase "any

other weapon" includes certain devices "from which a shot can be discharged through the energy

of an explosive," *id.* § 5845(e).   By contrast, under the statutory definition, an "explosive

grenade" or other munition listed in subsection (f)(1) need not be shown to function in any

particular way, so long as it is proved to be the thing itself—that is, a munition designed for use

by the military.   Put another way:   machineguns, bazookas, and other similar weapons are

defined by what they *do*; grenades and other (f)(1) weapons by what they *are*.   *See United States*

*v. Sheehan*, 838 F.3d 109, 119-20 (2d Cir. 2016) (nonfunctioning bomb with inoperable fuze is

an "explosive bomb" under subsection (f)(1) because it contains explosives and is thus "capable

of exploding"); *Posnjak*, 457 F.2d at 1116 (explaining that "[s]ubparagraph (1)" weapons are

"articles of military ordnance" and "subparagraph (2)" weapons are devices that "will" or can

"readily be converted" to "expel a projectile").

Moreover, the adjective "explosive" in subsection (f)(1) does not create an operability requirement.   Unlike other definitions of "firearm" in section 5845, the adjectives listed in subsection (f)(1)—"explosive," "incendiary," and "poison gas"—describe how the enumerated weapons *injure or damage*, not how the weapons *function or operate*.   Put another way, in contrast to weapons defined in other subsections that are identified as particularly dangerous by *how they operate*, subsection (f)(1) singles out for registration readily identifiable military munitions that are particularly dangerous because of *how they cause destruction*:   by explosion; by fire; or by poison gas.   *See Sheehan*, 838 F.3d at 119-20; *United States v. Simmons*, 83 F.3d 686, 687 (4th Cir. 1996) ("Without ever as much as suggesting that a defendant must possess a means by which to ignite the device, courts have uniformly held that a fully-assembled Molotov cocktail-defined as a device comprising a bottle, gasoline, and a rag-constitutes an 'incendiary . . . bomb' or 'similar device' under section 5845(f)[1]." (citing cases from the First, Fifth, and Tenth Circuits)).[9]   "Explosive" must be read in this context and the Court should not read into it

---

[9] Similarly, the U.S. Court of Appeals for the Armed Forces held that ammunition fell within the definition of "explosive" under the Rules for Courts-Martial ("R.C.M.") because it contained gunpowder, a defined explosive.   *United States v. Murphy*, 74 M.J. 302, 305-06 (C.A.A.F. 2015) ("R.C.M. 103(12) identifies the essential components of ammunition as a projectile, such as a bullet, and the explosive that expels it, typically gunpowder.").   In so holding, the court looked to the definitions in 18 U.S.C. § 232(5) (which defines "explosive . . . device" to include "dynamite and all other forms of high explosives" without any additional components and "any explosive bomb, grenade, missile, or similar device") and R.C.M. 103 for guidance.   *Id.*

Although the issue of operability was not before the court in *Murphy*, this distinction—that the adjective "explosive" in 18 U.S.C. § 232(5) and R.C.M. 103(11) refers not to operability but to devices that cause destruction by exploding—is presupposed in the court's analysis:

[T]he language of 18 U.S.C. § 232(5), R.C.M. 103(11) limits the application to "any *explosive* bomb, grenade, missile, or similar device" . . . indicating that it does not apply, for example, to common smoke grenades, which do not explode or ignite but only emit smoke as a signal or to provide concealment."

*Murphy*, 74 M.J. at 306 (emphasis in original) (device is "explosive" if "ignition by fire, by friction, by concussion, by percussion, or by detonation of the . . . device or any part thereof may cause an explosion"

7

an operability requirement that is absent from the plain language of the statute.   *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words . . . .'" (citation omitted)).

To read a nonexistent operability requirement into the statute would require that objectively identifiable and particularly dangerous military munitions be tested every time criminal charges are brought to determine if they are actually operable.   Such an approach is contrary to the plain language of the statute and has been rejected by at least four circuit courts.[10] *See Sheehan*, 838 F.3d at 119-20 (bomb with inoperable fuzing system still an "explosive bomb"); *United States v. Unthank*, 107 F. App'x 625, 628-29 (6th Cir. 2004) (training grenade modified to include explosive material but inoperable because the fuze "did not fit properly" is a destructive device because "a destructive device need not operate as intended to satisfy the statute"); *United States v. Langan*, 263 F.3d 613, 625 (6th Cir. 2001) (rejecting defendant's argument that "destructive device" must be "operable or readily made operable":   "the government need not establish that any particular component be present for a device to qualify as a destructive device.   The only requirement is that the device be capable of exploding or be

---

(quoting 18 U.S.C. § 844(j) incorporated into R.C.M. 103(11)); *see also Sheehan*, 838 F.3d at 119-20 (inoperable bomb "explosive" because it is "capable of exploding" by some means).

[10]  Indeed, the view that a grenade with an inoperable fuze is not a grenade would have serious implications for law enforcement as undercover operations would be impossible without creating a serious risk of harm to the public.   In addition, a defendant who purchases an unregistered lethal fragmentation grenade on the black market would avoid prosecution under the NFA if, by happenstance, the fuze did not function.   Similarly, a possessor of an otherwise live and lethal grenade could evade prosecution under the NFA simply by removing the device's fuze and storing the fuze in a distant place until the moment before he uses it.   In such a case, the defendant might successfully claim that the de-fuzed weapon was not a "grenade" under the NFA, and that the separation of grenade and fuze made "ready assembly" of a functioning device impossible under subsection (f)(3).   This is not required by the text of the statute and it is unlikely that Congress intended such a perverse result.

readily made to explode"); *United States v. Evans*, 526 F.2d 701, 707 (5th Cir. 1976) (dynamite bomb is a "destructive device" even though government agents twice failed to detonate it); *United States v. Kiliyan*, 456 F.2d 555, 557 (8th Cir. 1972) (black powder modified grenade that failed to detonate still a "destructive device.").

Put simply, when passing the NFA, Congress was concerned with "the influx of surplus military weapons into this country," and "intended to bring within the Act items of heavy military ordnance that had no legitimate private use and constituted a substantial threat to public safety." *United States v. Oba*, 448 F.2d 892, 897 (9th Cir. 1971) (Browning, J., dissenting on other grounds);[11] *accord Posnjak*, 457 F.2d at 1115-16. Thus, "Subparagraph (1) of the definition [of destructive device]" applies to "articles of military ordnance" and "objectively identifiable weapons of war." *Posnjak*, 457 F.2d at 1115-16. There is nothing in the text of the statute or the legislative history requiring that such devices be operable so long as they can be

---

[11] *Oba* was a "combination of parts" case under subsection (f)(3) where the majority held that a homemade explosive that included commercially available dynamite was a "destructive device." The dissent argued for a narrower reading of the NFA to apply only to "gangster-type weapons and *military ordnance* specifically described in the Act." *Oba*, 448 F.2d at 898 (emphasis added) (Browning, J., dissenting) ("Congress intended to add only military ordnance having little or no appropriate civilian use, and not such common commercial explosives as those involved here."). However, the majority rejected such a narrow reading of "destructive device," reasoning that:

> The definition [of destructive device] excluded "any device, although originally designed for *use* as a weapon, which is *redesigned* for use as a signaling, pyrotechnic, line throwing, safety, or similar device.' Here, appellant's own admission establishes that the weapon in issue had not been redesigned for any such use.

*Id.* at 894 (emphasis in original) (quoting 26 U.S.C. § 5845(f)). The grenades in this case are a "destructive device" under both approaches: they are military ordnance that have not been "redesigned" at all, much less redesigned for a use specified in § 5845(f). *See infra* Section II.b & n.19; 10 U.S.C. § 101(e)(4)(B)(iii); 26 U.S.C. § 5845(f).

made to explode.[12]  *See United States v. Sheehan*, No. 13-CR-0186 (DRH), 2014 WL 3490323, at *6–8 (E.D.N.Y. July 11, 2014), *aff'd*, 838 F.3d 109 (2d Cir. 2016) ("Nothing in language of § 921(a)(4)(A)[13] or its legislative history supports defendant's argument that an operable fusing system is an essential element of an explosive bomb, and relevant judicial decisions are contrary to defendant's position." (alterations to capitalization omitted)).

This plain-reading construction of § 5845(f)(1) also corresponds with the definitions of "explosive . . . device" in 18 U.S.C. § 232(5)(A) (which defines high explosive material without any additional components—including a fuze—as an "explosive device") and "military munitions" in 10 U.S.C. § 101 (which sets out definitions for statutes concerning the armed forces).[14]  Section 101 of Title 10 defines "military munitions" to include "all ammunition products and components *produced for or used by the armed forces* for national defense and security."   10 U.S.C. § 101(e)(4)(A) (emphasis added).   Then, after listing specific examples—including grenades, *id.* § 101(e)(4)(B)(iii)—the statute excludes from the definition: (i) "*[w]holly inert items*"; (ii) improvised explosive devices ("IEDs"); and (iii) nuclear weapons.

---

[12]  As the Second Circuit explained in *Posnjak*:

> The legislative history suggests strongly . . . that Congress was concerned in the National Firearms Act mainly with clearly identifiable weapons which were the cause of increasing violent crime and which had no lawful uses, and that the intent of the user of these weapons was irrelevant, as they were so prone to abuse that they were considered per se dangerous and unnecessary for legitimate pursuits.   Congress did not mention or deal with possible unlawful uses of otherwise legitimate devices, but concentrated on objectively identifiable weapons of war and "gangster-type weapons."

457 F.2d at 1116.

[13]  The definition of "destructive device" in 18 U.S.C. § 921(a)(4) is substantively identical to the definition in 26 U.S.C. §5845(f).

[14]  The defendant concedes that the Marine Corps has adopted this definition of "military munition."   *See* Def. Mem. at 63-64 (quoting Marine Corps Order P8020.10B, Marine Corps Ammunition And Explosives Safety Program, at A–2–A–3, *available at* http://www.marines.mil/Portals/59/Publications/ MCO%20P8020.10B.pdf.

*id* § 101(e)(4)(C) (emphasis added).[15]   Similarly, a destructive device under (f)(1) must contain explosive material, incendiary material, or poison gas:   it cannot be "wholly inert."[16]   But a "partially inert" grenade produced for the armed forces, such as the grenades at issue here, is a "military munition" under Title 10.   Such a device—an inoperable but explosive military munition—fits squarely within the plain language of the NFA and is the kind of "objectively identifiable weapon[] of war" that Congress had in mind when crafting the definition of a "destructive device."

> b. The M67 Grenades In This Case Are "Explosive Grenades" Because They Were Designed To Be Weapons And Are "Capable Of Exploding."

Though the First Circuit has not addressed whether a grenade must be operable to be a firearm, the Court has consistently held that "operability" is not a required element in other

---

[15] Although 10 U.S.C. § 101 excludes IEDs from the definition of "military munition," 26 U.S.C. § 5845(f) defines "destructive device" to include not only military munitions, § 5845(f)(1), but also IEDs through the "combination of parts" analysis in § 5845(f)(3).   *See U.S. v. Johnson*, 152 F.3d 618, 624, 627–28 (7th Cir. 1998) ("When the device is inherently susceptible only to a use that makes it a destructive device, no further inquiry is necessary; [subsection (f)(1)] proscribes its possession.   When the defendant possesses parts susceptible to both a destructive and constructive use, however, further inquiry is necessary [under subsection (f)(3)] in order to ensure that the individual who uses such material to achieve a good social or commercial purpose is not subject to criminal liability."); *Posnjak*, 457 F.2d at 1115-16 ("Subparagraph (1) of the definition [of destructive device]" applies to "articles of military ordnance"; subparagraph (3) applies to "any combination of parts designed or intended for use in converting any device into a destructive device as defined in the earlier two subparagraphs and from which such a device may be readily assembled").

Put another way, § 5845(f) does not *narrow* the definition of military munitions, but expands it to include military munitions *and* IEDs or other home-made devices that, though not military-designed weapons, are designed to be similarly destructive.   *Cf. U.S. v. Markley*, 567 F.2d 523, 526-27 (1st Cir. 1977) (explaining that the First Circuit interprets § 5845(f)(1) broadly to not only include "military ordnance and gangster type weapons" but also "home-made devices" that likewise have "no legitimate social purpose").

[16] *Cf. United States v. Murphy*, 73 M.J. 699, 701 (A. Ct. Crim. App. 2014), aff'd, 74 M.J. 302 (C.A.A.F. 2015) (ammunition is "explosive" for purposes of Article 103 of the Uniform Code of Military Justice, 10 U.S.C. § 903, because it "contains gunpowder or smokeless powder," which "is unambiguously an explosive").

11

firearms cases—that is, a "firearm" must be "real," rather than a toy or replica, but it need not be proved to be loaded or operable.   *United States v. Martinez-Armestica*, 846 F.3d 436, 440 (1st Cir. 2017) (§ 924(c) conviction); *see also, e.g.*, *United States v. Pena-Lora*, 225 F.3d 17, 31-32 (1st Cir. 2000) (inoperable UZI submachinegun is a "machinegun" under § 924(c)); *United States v. Alston*, 112 F.3d 32, 33-35 (1st Cir. 1997) (affirming conviction for being felon in possession of inoperable firearm that was "rusted and pitted," with no magazine and a slide "rusted solid"); *United States v. Veilleux*, 40 F.3d 9, 10 & n.1 (1st Cir. 1994) ("[T]he government need not prove that the gun is *capable* of firing so long as it demonstrates that it was *designed* to fire." (citing *United States v. Ruiz*, 986 F.2d 905, 910 (5th Cir. 1993))); *United States v. Kirvan*, 997 F.2d 963, 966 (1st Cir. 1993) (noting "common ground that the gun need not be proved to be loaded or operable in order to convict," but that "a toy or replica will not do").

Importantly, these First Circuit decisions do not turn on the "objective capability" clauses—*e.g.*, weapons that can be "readily restored" or "readily converted" to operability—in the firearms statutes.[17]   *See Crooker*, 608 F.3d at 98 ("[T]he machine-gun provision, by contrast to the silencer definition, explicitly adopts a test of objective capability:   it covers any weapon '*which shoots*, is designed to shoot, *or can be readily restored to shoot*' automatically multiple shots with a single trigger pull." (emphasis in original, citation omitted)).   Rather, the First Circuit and other circuits that have addressed this issue consider whether the device at issue is

---

[17]   *See, e.g.*, 18 U.S.C. § 921(a)(3)(A) ("firearm" means "any weapon . . . *which will* or is designed to or may *readily be converted* to expel a projectile by the action of an explosive"); 26 U.S.C. § 5845(b) ("machinegun" means a weapon "*which shoots*, is designed to shoot, or can be *readily restored to shoot*" automatically by a single trigger pull); § 5845(f)(2) (bazooka or other large-bore destructive device must be one "*which will*, or which may be *readily converted* to, expel a projectile by the action of an explosive or other propellant") (all emphases added).

*designed* to be a firearm.[18]   That is, when considering whether an inoperable firearm is a

"firearm" to support criminal charges, the Court determines what the device at issue is designed

to be, *not* whether it can be readily restored to operability.

Likewise, § 5845(f) defines in subsection (f)(1) certain military munitions as *per se*

destructive devices, then excludes from the definition of "destructive device" devices that are

"neither designed nor redesigned for use as a weapon" or devices, though "originally designed

for use as a weapon," that are "redesigned" for use as a "signaling, pyrotechnic, line throwing,

safety, or similar device."[19]   Thus, as in other firearm cases, an inoperable device designed to be

a military munition—in this case a grenade—that contains explosives, incendiary material, or

poison gas is a "destructive device" under subsection (f)(1) and is therefore a "firearm" under

section 5845(a).   *See Sheehan*, 838 F.3d at 120 ("[T]he jury could rationally find that the device

---

[18] *See U.S. v. Dotson*, 712 F.3d 369, 370 (7th Cir. 2013) (affirming conviction where defendant's firearm was inoperable, reasoning that "[a] gun is still a gun—a weapon *designed* to expel a projectile by means of explosive action—even though it is in bad condition and can be restored to working condition only by a gunsmith"); *U.S. v. Rivera*, 415 F.3d 284, 286 (2d Cir. 2005) ("Where a weapon *designed* to fire a projectile is rendered inoperable, whether on purpose or by accident, it is not removed from the statute's purview; although it is temporarily incapable of effecting its purpose, it continues to be '*designed'* to fire a projectile"); *U.S. v. Yannott*, 42 F.3d 999, 1006 (6th Cir. 1994) (concluding that "the broken firing pin merely temporarily altered the weapon's capability and did not so alter the weapon's *design* that it no longer served the purpose for which it was originally *designed*") (all emphases added).

[19] It is undisputed that the grenades in this case were originally designed as a weapon.   *See supra* Section I; Def. Mem. at 1-2 & n.1, 6-12, 62.   Moreover, the grenades in this case were not "redesigned" to be something other than weapons, since the grenades were never converted into an object with a distinct purpose and value.   *See Sheehan*, 838 F.3d at 120; *U.S. v. Hammond*, 371 F.3d 776, 781 (11th Cir. 2004) (in assessing whether armed cardboard tube was "designed" as a weapon, "the critical inquiry is whether the device, as designed, has any value other than as a weapon"); *Oba*, 448 F.2d at 894.   And, as discussed, firearms that are rendered inoperable are still "designed" to be firearms and are not "redesigned" in any way.   Moreover, recently in *United States v. McLarnon*, explosives expert Travis McCrady testified that the live M67 grenades combined with an inoperable fuze are not "inert" and are not signaling, pyrotechnic, line throwing, safety, or similar devices.   *U.S. v. McLarnon*, 1:15-cr-00212-SM, McCrady Testimony, Jan 26, 2018 (transcript pending).   To the extent the defendant contends that the grenades were somehow redesigned within the meaning of § 5845(f), that is a factual dispute that must be resolved at trial, not in a motion to dismiss.

was objectively designed as a weapon even if it was missing a component required to enable it to explode in a specific way."); *cf. United States v. Rushcamp*, 526 F.2d 1380, 1382 (6th Cir. 1975) (inoperable rocket launcher is a "destructive device" because it is "exactly the 'military-type' weapon that the statutes speak of"); *United States v. Hasan*, No. 2:10CR56, 2011 WL 10620312, at *4 (E.D. Va. Mar. 9, 2011), *aff'd sub nom. United States v. Dire*, 680 F.3d 446 (4th Cir. 2012) (citing non-destructive device firearms cases to affirm conviction of possession of destructive device not shown to be operable).

The cases cited by the defendant are consistent with this approach. In *United States v. Blackburn*, 940 F.2d 107 (4th Cir. 1991) and *United States v. Malone*, 546 F.2d 1182 (5th Cir. 1977), the courts relied on the inapplicable "combination-of-parts" subcategory described in subsection (f)(3) to reverse convictions involving "inert" grenades that, unlike the grenades here, did not contain any explosive material. *Cf. Sheehan*, 838 F.3d at 119-21 (treating "explosive bomb" analysis under (f)(1) as separate and distinct from "the alternative combination-of-parts" analysis under (f)(3)). However, "these cases [do not] require the government to prove beyond a reasonable doubt that each component is present; instead, the government's burden is to prove beyond a reasonable doubt that the devices are destructive or could be readily made so." *United States v. Wilson*, No. 92-5075, 1992 WL 227472, *2 (6th Cir. Sept. 15, 1992) ("[A] device may fall within the definition of a 'destructive device' even if it does not operate as intended."); *accord Sheehan*, 838 F.3d at 119-120 (bomb with inoperable fuzing system is a destructive device); *Langan*, 263 F.3d at 625 ("The only requirement is that the device be capable of exploding or be readily made to explode"). Put another way, an inoperable grenade that contains explosives is still "capable of exploding" and is therefore a destructive device, but a

14

grenade that contains no explosive material is not "capable of exploding," and is thus not designed to be a weapon and not a destructive device under section 5845(f).[20]

In *United States v. Malone*, the defendant possessed a pressure release spring-top box containing a military MK2 fragmentation hand grenade hull, inserted rigidly to the inside of the box, miscellaneous electrical wires inserted into the top of the hand grenade body, a micro-switch, an electrical solenoid switch, a transistor battery, a small low voltage electrical bulb, glue, tape, small aluminum metals, nails, waterproofing spray, and a container of Play-doh modeling compound.   But he did not possess *any* explosive charge.   The appeals court reversed his conviction because the defendant did not possess all of the component parts from which a destructive device might be readily assembled under subsection (f)(3).   546 F.2d at 1184.[21] The court in *Malone* expressly limited its holding to the unexceptional proposition that, under subsection (f)(3), "the complete absence of explosive material would prevent the component parts in the defendant's possession from being a destructive device."   *Id.* at 1184.[22]   *Malone*

---

[20] Likewise, although high explosive material without any additional components is an "explosive . . . device," 18 U.S.C. § 232(5)(A), explosive material *alone* is not a destructive device.   *See U.S. v. Roach*, 28 F.3d 729, 735-36 (8th Cir. 1994) (brick of C-4 plastic explosive with no other components is not a destructive device, but is a "dangerous weapon" for USSG § 2D1.11(b)(1) sentence enhancement); *Posnjak*, 457 F.2d at 111-12 (dynamite with unattached fuse and caps is not a destructive device).

[21] *Malone* was indicted as a "combination of parts" case under subsection (f)(3), and did not involve a military munition under subsection (f)(1).   546 F.2d at 1183.   The Superseding Indictment in this case charges Mr. Musso with receiving or possessing grenades under subsection (f)(1), not with receiving a "combination of parts" under subsection (f)(3).

[22] Specifically, the court explained,

> We make no attempt here to define what may or may not constitute a 'destructive device' or its components within the language of the statute.   What we do hold is that the complete absence of explosive material would prevent the component parts in the defendant's possession from being a destructive device.   Our decision is limited solely to the facts of this case.

*Malone*, 546 F.2d at 1184.

simply does not hold that an object specified in subsection (f)(1) must be "operable" to qualify as a destructive device.

In *United States v. Blackburn*, the Fourth Circuit, relying on *Malone*, held that "inert" grenades were not "destructive devices" under former § 2K2.2 of the sentencing guidelines. 940 F.2d at 110.   In the course of a reverse sting operation, an undercover agent removed two grenades from a case of thirty (for the supposed purpose of murdering a policeman), then placed the case of grenades in the defendant's truck.   Only the two grenades removed by the agent contained explosives; the other twenty-eight, as in *Malone*, "lacked powder and were *incapable of being detonated*."   940 F.2d at 108 (emphasis added).   The sentencing court counted all thirty of the grenades as destructive devices.   The appeals court, citing *Malone* and two other combination-of-parts cases, vacated the sentence, stating that a defendant may be penalized under the guideline "for only that number of destructive devices which may be 'readily assembled' from the parts in his possession.   A defendant must possess *every* essential part necessary to construct a destructive device."   940 F.2d at 110.[23]   But the *Blackburn* analysis is

---

[23] *Blackburn* has caused some confusion due to its imprecise reasoning, which may seem to imply that its analysis under subsection (f)(3) is equally applicable to the entire definition of "destructive device," including under subsection (f)(1).   For example, *Blackburn* quotes *United States v. Davis*, 313 F. Supp. 710, 713 (D. Conn. 1970), as stating:   "[W]hat Congress meant by the term [destructive device] was an association of the components of a destructive device, at the same time and place, capable of being converted into a destructive device . . . ."   940 F.2d at 110.   However, the context of that quotation makes clear that the court in *Davis* was discussing the meaning of term "combination" under (f)(3), *not* the meaning of "destructive device" generally:

> It is true that the common meaning of the term combination is union.   The context in which the term 'combination' is used in the Act, however, clearly indicates that what Congress meant by the term was an association of the components of a destructive device, at the same time and place, capable of being converted into a destructive device—not an actual union of parts in an assembled device.   Defendant's argument that, under such a construction of the term combination, the contents of almost any household would fall within the purview of the Act is without merit, since Section 5845(f) specifically provides

inapplicable here, since, again, the court analyzed the issue under subsection (f)(3) and the devices at issue in that case did not contain any explosive material and were thus incapable of exploding.   The *Blackburn* court simply did not address the type of device here:   an objectively identifiable military grenade that contains explosives and thus is capable of exploding despite having an inoperable fuze.[24]   Thus, like *Malone*, *Blackburn* does not hold that a military munition must be operable to be a destructive device under subsection (f)(1).   *See Hasan*, 2011 WL 10620312, at *4 (distinguishing *Blackburn* to affirm conviction of possession of destructive device not shown to be operable, reasoning that "firearms need not be recovered (and shown to be genuine and functioning) in order for a defendant to be convicted for possessing them").

     *Malone* and *Blackburn* therefore stand for the unremarkable proposition that grenade bodies that do not contain any explosive material are not "destructive devices" because they are not "capable of exploding" and cannot be readily made to do so.   *See Langan*, 263 F.3d at 625; *Wilson*, 1992 WL 227472, at *2.   However, unlike the grenades in *Malone* and *Blackburn*, the grenades in this case are not "inert"—they contain explosive material (6.5 ounces of Composition B high explosive) and are "capable of exploding."   *Langan*, 263 F.3d at 625; *see also Unthank*, 107 F. App'x at 628-29 (rational jury could find inoperable modified training grenade that contained explosive material to be a destructive device).   Thus, they are "explosive

---

       that only a 'combination of parts either designed or intended for use in converting any device into a destructive device' constitutes a destructive device.

*Davis*, 313 F. Supp. at 713 (quoting 26 U.S.C. 5845(f)(3)).

[24]  In one other case not cited by the defendant, *United States v. Osuna*, 189 F.3d 1289 (10th Cir. 1999), the Tenth Circuit, citing only *Blackburn*, held that it was plain error to include the "inert" grenades in the sentence.   The opinion contains no reasoning beyond the citation to *Blackburn* and, in that case, the government confessed error.   The court did not explain (and the government here has not been able to determine) what rendered the grenades "inert."

grenades" under subsection (f)(1) and consequently are "destructive devices" under the NFA. *Sheehan*, 838 F.3d at 119-20.   "That the [grenades can] not explode in the way its maker"—or the defendant—"might have assumed was the ordinary or even only way in which it could be detonated—*i.e.*, via the fuzing system—because it lacked a particular component of which such a device is ordinarily composed, is irrelevant."   *Id.*

<p style="text-align:center">*      *      *</p>

The military-issued M67 fragmentation grenades in this case are objectively identifiable military munitions designed as weapons for the United States military and, even with an inoperable fuze, they remained "capable of exploding."   Thus, under the plain language of the NFA and relevant judicial opinions a rational jury could find the grenades to be "destructive devices" under 26 U.S.C. § 5845(f)(1) and therefore "firearms" under the NFA.

### III. The Defendant's Claims of "Illegal Activity" and "Outrageous Misconduct" in the FBI's Handling of the Grenades Are Meritless.

The defendant's remaining and lengthy arguments in his Motion and accompanying memorandum, mostly consisting of citations to and quotations from disparate federal regulations, and unsubstantiated intimations that the FBI acted unlawfully in obtaining, transporting, and storing the grenades in this case, deserve short shrift, for several reasons.

First, as shown by the attached Declaration of FBI Special Agent Brian LeBlanc, the assigned FBI Bomb Technician in this case, the FBI at all times kept the four grenades safe, secure, subject to highly restricted access, and in their original condition, by (i) assigning a single Bomb Technician (LeBlanc) to maintain custody over them at all times except during the undercover sale to the defendant; (ii) photographing the well-marked grenades at several junctures; (iii) keeping them during the investigation in a padlocked ATF-approved Type 3

<p style="text-align:center">18</p>

explosives storage box; (iv) transporting them in a specially equipped FBI Bomb Tech truck; and (v) storing them in FBI-Boston's Explosive Storage Magazine at Logan Airport, an ATF-approved Type 1 explosives storage container.   LeBlanc Decl. ¶¶ 2-6, 10-11.   Put simply, if the FBI could have done anything more than it already has in this case to guarantee the safety and integrity of the grenade exhibits, the defendant has failed to identify it.

Second, any claim by the defendant that the FBI acted unlawfully in receiving, possessing, and transferring the grenades in this undercover investigation is frivolous.   FBI agents are expressly authorized to "carry firearms," 18 U.S.C. § 3052, and firearms otherwise subject to registration under the National Firearms Act are exempt from that requirement if they are "in the possession of or under the control of the United States," 26 U.S.C. § 5841(a); *see United States v. Springer*, 609 F.3d 885, 890 (6th Cir. 2010) (recognizing exception to registration requirement, with result that "federal agents are not vulnerable to prosecution for performing their firearm-related duties, and the government's ability to possess and employ firearms is not jeopardized").   Likewise, a firearm may be transferred without payment of the federal transfer tax to "possession of the United States, any political subdivision thereof, or any official police organization of such a government entity engaged in criminal investigations." 26 U.S.C. §5853(a).   And large swaths of federal law regulating the handling of explosive materials do not apply to "the transportation, shipment, receipt, or importation of explosive materials for delivery to any agency of the United States," or to the "distribution to or storage or possession [of explosive materials] by . . . agencies of the United States."   18 U.S.C. § 845 (a)(3), (6); *see also* 27 C.F.R. §555.141(a)(3), (5) (establishing similar exemptions from ATF's regulation of commerce in explosives).   In short, the defendant cannot show that FBI's undercover sale of

grenades in this case was anything other than lawful and "ordinary conduct in a conventional sting operation."   *United States v. Gibbens*, 25 F.3d 28, 31 (1st Cir. 1994) (recognizing that undercover operations "comprise a valuable, and generally lawful, weapon in the government's armamentarium").[25]

Third, the defendant has utterly failed to allege or show that the grenades in this case were altered, modified, or otherwise doctored while in the government's custody, and instead claims that absent further documentation about the handling of the grenades he is entitled to a "very strong inference that the Government did not comply with the law."   Def. Mem. at 50. But the opposite is true:   because the defendant has offered no evidence that the grenades were altered, the government is entitled to a "presumption of official regularity," and any possibility that the grenades were tampered with during the relevant period is for the jury to assess, and not a basis for dismissal.   *United States v. Luna*, 585 F.3d 1, 6 (1st Cir. 1978) (affirming trial court's admission of heroin exhibit despite challenge to chain of custody, where agents in charge of evidence accounted for it for entire relevant period, either by official records or by testimony concerning normal police procedures, and defendants "offered no evidence that the drugs had been altered"); *accord United States v. Boykins*, 9 F.3d 1278, 125 (7th Cir. 1993) (where exhibit's chain of custody is in question but there is no evidence of tampering, "there is a presumption that a system of regularity" accompanied exhibits in official custody); *see also* LeBlanc Decl. ¶ 11.   Thus, because it lacks specifics, the defendant's lengthy argument

---

[25]  Moreover, even if the FBI as transferor of the grenades violated federal law by failing to register them (which it did not), "it is no defense to a NFA prosecution that the transferor also violated the statute by failing to register the transfer."   *United States v. Dodge*, 852 F. Supp. 135, 139 (D. Conn. 1994) (holding that because transferee has affirmative duty to ensure that firearm is registered properly prior to taking possession, "the government's conduct in failing to register the firearms . . . had no effect on the defendants' prosecution under 26 U.S.C. § 5861(d)").

regarding chain of custody is facially insufficient to overcome the presumption of official regularity in the FBI's handling of the grenades.

Fourth, the defendant's chain of custody attack is fundamentally flawed because it assumes that the grenades cannot be readily identified as the weapons the defendant received without chain of custody evidence, and it also assumes that the grenades' history and pedigree prior to the events in this case (including the circumstances under which the FBI acquired the grenades from the Department of Defense) are relevant.   Each of those assumptions is incorrect, however.   The grenades *can* be readily identified as the items actually used in this case based on their markings and the distinctive scratches made on them by Travis McCrady of the FBI's explosives unit.   Thus, the grenades are properly admissible even without chain of custody evidence.   *See United States v. Abreu*, 952 F.2d 1458, 1467 (1st Cir. 1992) (admitting sawed-off shotgun, and noting that evidence is properly admitted "if it is readily identifiable by a unique feature or other identifying mark," while chain of custody evidence is necessary if exhibit "is of the type that is not readily identifiable or is susceptible to alteration").   In addition, the manner in which FBI came into possession of the grenades *before* their use in this investigation is categorically irrelevant, since it is of no consequence in resolving the charges in the indictment. Fed. R. Evid. 401.   Thus, the defendant's signal focus on the legality of the Department of Defense's sale of the grenades to FBI amounts to nothing.

Fifth, the defendant's most concrete accusation—that the chain of custody form the government provided in discovery (Exhibit A to LeBlanc Declaration) was filled out after the grenades were placed in evidence—although correct, is no basis for dismissal, since the creation of the form resulted from innocent mistake, and nothing more.   As recited in his Declaration,

21

Agent LeBlanc (i) completed a hard-copy chain of custody form (along with an electronic

Collected Item Log) three days after the defendant's arrest and two days after storing the

grenades at the Logan Airport Magazine; (ii) kept the form at his desk at FBI-Boston, intending

to deliver it to the Logan Airport Magazine the next time he went there; (iii) did not visit the

Logan Airport Magazine for a considerable period, and misplaced the chain of custody form

when FBI-Boston relocated to another building in November 2016; (iv) when he realized that the

original form was missing, consulted FBI's Evidence Control Unit and was advised to complete

a new chain of custody form to accompany the evidence; and (v) filled out a new form with

precisely the same accurate information that was contained in the original form.   LeBlanc Decl.

¶¶ 7-9.   In short, in replacing a misplaced chain of custody form with a new one containing the

same information, Agent LeBlanc did nothing wrong, and nothing that prejudiced the defendant

in any respect.   *See Elkin v. Fauver*, 969 F.3d 48, 53 (3rd Cir. 1992) (noting that prison's use of

disapproved chain of custody form was "utterly harmless" where form contained complete

record of chain of custody).

        Sixth, and finally, the defendant's showing of "outrageous misconduct" by the FBI falls

miles short of the required threshold under the Due Process Clause.   Dismissal of an indictment

based on "outrageous government misconduct" is appropriate "only in those very rare instances

when the government's misconduct is so appalling and egregious as to violate due process by

'shocking . . . the universal sense of justice.'"   *United States v. Luisi*, 482 F.3d 43, 59 (1st Cir.

2007) (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)).   The defense is reserved for

only the most egregious circumstances, and should not be invoked each time the government acts

deceptively or participates in a crime that it is investigating.   *United States v. Therrien*, 847 F.3d

9, 14 (1st Cir. 2017).   Here, the defendant identifies no misconduct, and certainly nothing

"outrageous," in the FBI's handling of the grenades, beyond the supposed absence of paperwork

to demonstrate that agency's strict compliance with a smorgasbord of federal regulations.

Because these circumstances do not present "the rare case where any government misconduct

was sufficiently blatant, outrageous, or egregious," the defendant's claim for dismissal must fail.

### IV.    Conclusion.

A rational fact finder could find that the grenades in this case are "destructive devices"

and therefore firearms as defined by 26 U.S.C. § 5845.   The defendant's remaining arguments

fail to allege a basis for dismissal under Federal Rule of Criminal Procedure 12(b).   For these

reasons and the reasons in this Memorandum, the Court should deny the Defendant's Motion to

Dismiss.

<div style="margin-left: 50%;">

Respectfully Submitted,

JOHN FARLEY
Acting United States Attorney

</div>

Dated: February 9, 2018

<div style="margin-left: 50%;">

/s/ Matthew T. Hunter
Matthew T. Hunter
Special Assistant U.S. Attorney

John S. Davis
Assistant U.S. Attorney

53 Pleasant Street, 4th Floor
Concord, New Hampshire 03301
(603) 225-1552
Matthew.Hunter@usdoj.gov
John.Davis8@usdoj.gov

</div>

**<u>Certificate of Service</u>**

I certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), on February 9, 2018.

<u>/s/ Matthew T. Hunter</u>
Special Assistant U.S. Attorney