UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

United States

   v.                              Criminal No. 16-cr-033-JD
                                      Opinion No. 2018 DNH 049

Daniel E. Musso, Sr.


O R D E R

Daniel E. Musso, Sr., is charged with four counts of receiving an unregistered firearm in violation of the National Firearms Act ("NFA"), 26 U.S.C. § 5801, et seq., and one count of receiving explosive materials in violation of 18 U.S.C. § 842(a)(3)(A).  Musso moves to dismiss all the charges against him, arguing that the govern        ment acted outrageously in handling critical evidence.  In addition, Musso moves to dismiss Counts I-IV charging violations of the NFA for receiving an unregistered firearm, arguing that he did not possess a firearm as defined by that statute.  The government objects.


Background

In this case, the government alleges that Musso illegally received a firearm and explosive materials when he purchased four M67 military fragmentation grenades from an undercover FBI agent.  Musso's motion challenges the government's acquisition

and handling of those grenades and whether those grenades qualify as firearms under the NFA.

For purposes of this motion, the following facts about the grenades are undisputed by both parties.  The FBI purchased the grenades at issue in this case from the United States Marine Corps in Quantico, Virginia.  In November of 2015, the FBI Explosives Unit in Quantico, Virginia sent the grenades to Brian Leblanc in Boston, who was a bomb technician for the FBI's Boston field office.  Shortly thereafter, the FBI began its investigation concerning Musso.

When Leblanc received the grenades, their original fuzes had been removed and replaced with inoperable fuzes.  As a result, the grenades would not explode if the pin were pulled, as they were designed to do.  Nevertheless, each grenade contained 6.5 ounces of Composition B high explosive material and was capable of exploding by means of a commercial detonator. Following Musso's arrest, the FBI searched Musso's premises and did not find any fuzes or detonating devices.

### Discussion

Musso moves to dismiss all counts, arguing that the government's conduct in acquiring, possessing, and transporting the grenades that it provided him was outrageous.  Musso also contends that dismissal is warranted because the government

2

cannot demonstrate an adequate chain of custody for the
grenades.  Finally, Musso moves to dismiss the four counts
against him under the NFA for receiving an unregistered firearm,
arguing that the devices that he allegedly possessed, military
grenades with inoperable fuzes, did not qualify as a firearm
under that statute.

I.   Government's Handling of the Grenades

Musso moves to dismiss the charges against him, arguing
that the government's handling of the grenades (1) constituted
outrageous conduct and (2) raises questions as to whether the
government will be able to prove a chain of custody for the
grenades.

A.   Standard of Review

Under Federal Rule of Criminal Procedure 12(b)(1), "[a]
party may raise by pretrial motion any defense, objection, or
request that the court can determine without a trial on the
merits."  Fed. R. Crim. P. 12(b)(1).  "A motion is capable of
pretrial determination 'if trial of the facts surrounding the
commission of the alleged offense would be of no assistance in
determining the validity' of the motion."  United States v.
Turner, 842 F.3d 602, 604 (8th Cir. 2016) (quoting United States
v. Covington, 395 U.S. 57, 60 (1969)).  Accordingly, although

courts may make pretrial factual findings in resolving a
pretrial motion, they may not "make factual findings when an
issue is inevitably bound up with evidence about the alleged
offense itself." Id. at 605 (internal quotation marks omitted).

    B.  Outrageous Conduct

    In support of his claim of outrageous conduct, Musso points
to an array of federal laws and regulations governing the
handling of weapons and explosive materials, including
registration requirements, military safety regulations, and
excise taxes for explosives.  Musso contends that because there
is no evidence that the government complied with these laws and
regulations, the court should infer that the government acted
unlawfully and dangerously, thereby putting the public at risk.
Musso further charges that such conduct is outrageous and that
the remedy for it is the dismissal of the charges against him.

    In response, the government has provided an affidavit from
Brian Leblanc, an FBI special agent, who states that the
grenades were stored safely at all times during the
investigation.  The government also argues that it is exempt
from the rules and regulations that Musso cites.  Finally, the
government argues that even if it did not comply fully with all
of the rules and regulations governing the handling of the

4

grenades, that conduct does not constitute outrageous conduct that would support dismissal of the charges.

"A defendant's claim of outrageous government misconduct faces a demanding standard, permitting the dismissal of criminal charges 'only in those very rare instances when the government's misconduct is so appalling and egregious as to violate due process by shocking . . . the universal sense of justice.'" United States v. Therrien, 847 F.3d 9, 14 (1st Cir. 2017), cert. denied, 137 S. Ct. 2227 (2017) (quoting United States v. Luisi, 482 F.3d 43, 59 (1st Cir. 2007)).  Although the defense is theoretically possible, the First Circuit has yet to approve its use, United States v. Luisi, 482 F.3d 43, 59 (1st Cir. 2007), and has remarked that it is "almost never successful," United States v. Santana, 6 F.3d 1, 4-5 (1st Cir. 1993).  Indeed, the defense is "reserved for only the most egregious circumstances and should not be invoked each time the government acts deceptively or participates in a crime that it is investigating."  Therrien, 847 F.3d at 14 (internal quotation marks omitted).

In addition, to benefit from an outrageous conduct defense the defendant must show that the conduct at issue violated some right of the defendant, not merely that the government harmed third parties.  Santana, 6 F.3d at 9 (overturning district

court's dismissal of indictment for outrageous government conduct based on the danger posed to the public when government agents allowed 13 grams of heroin to enter commerce); see also United States v. Teague, 469 F.3d 205, 210-11 (1st Cir. 2006)(rejecting outrageous conduct defense based on illegal search of third parties' property).

Here, the purported outrageous conduct that Musso points to is the government's noncompliance with a panoply of federal laws and regulations concerning the transport and regulation of explosives and weapons.  In the first instance, the relevance of the alleged conduct to the pending indictment is highly doubtful on its face, and Musso has not shown the relevance in his memorandum.  Furthermore, even if the court were to take Musso's unsubstantiated allegations as true—something that is far from certain—the conduct at issue does not rise to the level of outrageousness that is required to dismiss criminal charges.  In other words, the government's alleged failure to abide by the cited laws and regulations is not so appalling or egregious as to shock a universal sense of justice or fundamental fairness. Further, Musso does not explain how the public safety risk, that he contends the government may have created, had any detrimental effect on his due process rights.  To that end, Musso has failed to explain how the government's acquisition, safekeeping, and

transport of the grenades prior to the alleged crime at issue
has any bearing on the matters in this case.  Accordingly,
Musso's motion to dismiss based on the government's purported
outrageous conduct in handling the grenades is denied.[1]

### C. Chain of Custody

As another basis for dismissal, Musso argues that the
grenades, a critical piece of evidence in the government's case,
must be excluded from evidence because the government cannot
demonstrate an adequate chain of custody for them.  In support,
Musso points to the lack of documentary evidence tracking the
grenades from the time that the FBI acquired them from the
Marines to their arrival at the FBI's Boston field office.
Musso also asserts that the government's refusal or inability to
demonstrate compliance with the numerous laws and regulations
that he cited in support of his outrageous conduct argument
requires an inference that the government will not be able to

---

[1] On the last page of his memorandum, Musso raises the
argument that the court should also dismiss the indictment based
on the government's alleged misconduct under its inherent
supervisory powers.  To the extent Musso raises this argument as
a distinct basis for dismissal, separate from due process
concerns, that argument fails because (1) the conduct alleged is
not egregious enough to warrant such a remedy and (2) Musso has
not demonstrated that the alleged conduct prejudiced him.  See
United States v. Houlihan, 92 F.3d 1271, 1291 (1st Cir. 1996)
(explaining when courts may use supervisory powers to dismiss
charges).

demonstrate chain of custody for the grenades.  Finally, Musso contends that the government's chain of custody form was filled out months after his arrest, raising questions about its legitimacy.

In response, the government argues that the chain of custody inquiry is a factual one that is properly reserved for trial.  The government also argues that it will present evidence demonstrating that the grenades are admissible.  In support, the government has provided an affidavit from Brian Leblanc, who states that the grenades have been in his custody from the time they arrived in Boston until now, except for the hour and twenty-two-minute period when they were being used for the undercover transaction at issue in this case.  Leblanc asserts that while the grenades were in his custody, he kept them safeguarded in compliance with ATF regulations and did not tamper with them.  Finally, the government asserts that "the manner in which [the] FBI came into possession of the grenades before their use in this investigation is categorically irrelevant, since it is of no consequence in resolving the charges in the indictment."  Doc. no. 75 at 21.

Under Federal Rule of Evidence 901, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to

support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).  If evidence is not "readily identifiable by a unique feature or other identifying mark" or is "susceptible to alteration, a testimonial tracing of the chain of custody is needed." United States v. Espinal-Almeida, 699 F.3d 588, 609 (1st Cir. 2012) (internal quotation marks omitted).

When proof of chain of custody is necessary, the testimony must "'render it improbable that the original item either has been exchanged with another or has been tampered with or contaminated.'" United States v. Anderson, 452 F.3d 66, 80 (1st Cir. 2006) (quoting United States v. Abreu, 952 F.2d 1458, 1467 (1st Cir. 1992)).  Where that standard is met, any gaps in the chain of custody "'factor into the weight given to the evidence rather than its admissibility.'"  Id. (quoting Abreu, 952 F.2d at 1467).

As an initial matter, as the government points out, the handling of the grenades before the FBI used them in its investigation of Musso is not relevant to this case.  See Anderson, 452 F.3d at 80 ("In determining whether the evidence is admissible, the trial court must conclude that it was reasonably probable that the evidence had not been altered since the occurrence of the crime." (internal quotation marks

omitted).   Therefore, any purported gaps in the chain of custody for the grenades before they were delivered to the FBI's Boston field office for investigatory purposes does not support a finding that the grenades are inadmissible.

Further, chain of custody is an evidentiary issue that is usually best decided at trial.  See Hinkle v. Ford Motor Co., 2012 WL 5868899, at *4 (E.D. Ky. Nov. 20, 2012) ("Issues of authentication and foundation are issues which are better examined during trial as evidence is presented in context of the parties' arguments and testimony."); United States v. Perez, 405 F. Supp. 2d 852, 856 (N.D. Ohio 2005) (denying motion to dismiss based on assertion that government will not be able to establish chain of custody and noting that "[t]he defendant has not cited, and this court is not aware of any case or cases holding that a possible inability to construct a seamless chain of custody entitles a defendant to dismissal before the government has offered its proof.").  Here, the grenades' authenticity and chain of custody involve facts pertinent to the merits of the case, and therefore any question concerning the admissibility of the grenades is deferred until trial.

The defendant's motion to dismiss alleging the government's inability to authenticate the grenades is denied.  At trial the defendant may raise any relevant and material challenges to the

authenticity of the grenades from the time they arrived at the FBI's Boston field office to the time they are offered into evidence.

## II.  NFA Counts I-IV

Musso moves to dismiss Counts I-IV, charging him with receiving an unregistered firearm in violation of § 5861(d) of the NFA, arguing that the devices that he allegedly received do not qualify as firearms under that statute.

### A.  Standard of Review

"[C]ourts must not inquire into the sufficiency of the evidence underlying the indictment—for when a defendant seeks dismissal of the indictment, the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." United States v. Stepanets, 879 F.3d 367, 372 (1st Cir. 2018) (internal quotation marks omitted).  For this reason, courts "routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations."  Id. (quoting United States v. Guerrier, 669 F.3d 1, 4 (1st Cir. 2011)).

Nevertheless, a narrow exception to this rule allows a district court "to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts." United States v. Weaver, 659 F.3d 353, 355 n* (4th Cir. 2011) (noting near unanimity among circuit courts in concluding that courts may decide such a pretrial motion); United States v. Martinez-Mercado, 145 F. Supp. 3d 150, 151 n.1 (D.P.R. 2015) (deciding motion to dismiss indictment and observing that "[a]lthough the First Circuit Court of Appeals has not addressed this issue seven other circuit courts of appeals have squarely held that district courts may properly rule on a motion to dismiss an indictment when the facts are undisputed, the government does not object to the procedure, and the only question is a legal one.").

Here, the government has requested that the court resolve this issue.  Furthermore, the facts necessary to decide the issue are undisputed, meaning that the court's inquiry is a question of law.  For those reasons, the court will consider Musso's motion to dismiss Counts I-IV charging violations of the NFA.

B. <u>NFA Counts I-IV</u>

The government charges Musso with violations of 26 U.S.C. § 5861(d), which makes it unlawful "for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." <u>Id.</u> at § 5861(d).  Under the NFA, several types of weapons qualify as a "firearm," including a "destructive device." 26 U.S.C. § 5845(a)(8).  The NFA defines a "destructive device" as follows:

> The term 'destructive device' means (1) any explosive, incendiary, or poison gas . . . (B) grenade. . . or (F) similar device; (2) [not relevant]; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term 'destructive device' shall not include any device which is neither designed nor redesigned for use as a weapon . . . .

<u>Id.</u> at § 5845(f).

In support of its argument that the grenades without operable fuzes are destructive devices, and thus firearms under the statute, the government relies exclusively on the first subsection of § 5845(f)(1)(B), asserting that the devices Musso allegedly received were "explosive . . . grenades."  The government argues that Congress intended § 5845(f)(1) to apply to any device that is a "paradigmatic . . . example" of certain categories of the military weapons listed in that subsection. The government further argues that because the devices at issue

13

were originally designed as grenades for the military, and because they contained explosives, they were "explosive grenades" under the NFA, regardless of whether they contained a mechanism capable of initiating detonation or explosion.

In response, Musso argues that the devices he allegedly received do not qualify as "explosive grenades" because they did not have operable fuzes and therefore could not explode. Musso further contends that because he did not possess any mechanism that could ignite or detonate the devices, the devices were not explosive at the time of his arrest.

### 1.   Interpretation of the NFA

To determine the meaning of statutory language, courts "employ the traditional tools of statutory construction, including a consideration of the language, structure, purpose, and history of the statute." United States v. Gordon, 875 F.3d 26, 33 (1st Cir. 2017) (internal quotation marks omitted). The starting point of such an inquiry however, "is the text of the statute itself." Id. Where Congress has not defined the language at issue, courts should "assume those words carry their plain and ordinary meaning." Id. (internal quotation marks omitted); see also Artis v. D.C., 138 S. Ct. 594, 603 (2018) ("[W]e look first to [a statute's] language, giving the words

used their ordinary meaning." (internal quotation marks
omitted)).

Here, the ordinary meaning of "grenade" implies a device
that contains not only explosive material but also a means of
detonating that explosive material.  This conclusion is
supported by the dictionary definition of grenade, which is "[a]
small bomb or explosive missile that is detonated by a fuse and
thrown by hand or shot from a rifle or launcher."  See The
American Heritage Dictionary of the English Language, available
at https://ahdictionary.com/word/search.html?q=Grenade (2018);
see also Oxford Online English Dictionary (defining "grenade" as
"[a] small bomb thrown by hand or launched mechanically,"
available at https://en.oxforddictionaries.com/definition/
grenade, and defining bomb as "[a] container filled with
explosive or incendiary material, designed to explode on impact
or when detonated by a timing, proximity, or remote-control
device," available at https://en.oxforddictionaries.com/
definition/bomb).

Moreover, the term "grenade" in § 5845(f) is modified by
the word "explosive."  When used as a modifier, that word
suggests that the grenade must, in fact, be capable of
exploding.  See The American Heritage Dictionary of the English
Language (defining the adjective explosive as "(1) Relating to

or having the nature of an explosion. (2) Tending to explode."),
available at https://ahdictionary.com/word/search.html?q=
explosive; Oxford English Dictionary (defining the adjective
"explosive" as "[a]ble or likely to shatter violently or burst
apart"), available at https://en.oxforddictionaries.com/
definition/explosive.[2]  Accordingly, the court concludes that the
ordinary meaning of the phrase "explosive grenade" in § 5845(f)
is a device that is in and of itself capable of exploding.

### 2.     Interpretation by other courts

This interpretation is consistent with decisions from
courts that have considered whether a device that is not capable
of detonating may qualify as a "destructive device" under the
NFA.  In United States v. Malone, 546 F.2d 1182 (5th Cir. 1977),
the defendant was convicted under § 5845(3) for possessing a
fragmentation grenade hull that contained no explosive material.
On appeal, the Fifth Circuit overturned Malone's conviction,
holding that the lack of explosive material precluded the parts

---

[2] The government contends that the modifiers "explosive,
incendiary, or poison gas" in § 5845(f)(1) do not take on their
ordinary meaning but instead are meant to delineate the specific
way that the device causes destruction.  For example, the
government asserts that "explosive" in § 5845(f)(1) means that
the device at issue creates destruction "by explosion."  Doc.
no. 75 at 7.  Even if that is true, however, that meaning still
contemplates a device that is capable of exploding.

in the defendant's possession from being a destructive device.
Id. at 1184.  The court concluded that, although it agreed with
the government that the device had no legitimate or innocent
use, "from a proper interpretation of the statute, the defendant
cannot be guilty of the offenses charged because he did not have
in his possession all of the component parts from which a
destructive device might be readily assembled."  Id.

In United States v. Blackburn, 940 F.2d 107 (4th Cir.
1991), the Fourth Circuit confronted a similar issue.  The
defendant in Blackburn was arrested after purchasing thirty
grenades, only two of which contained explosive material.  Id.
at 108.  After being indicted for and then pleading guilty to a
single count of possessing a grenade, the district court
calculated Blackburn's sentence under the United States
Sentencing Guidelines, which increased a defendant's base level
offense based on the number of firearms he possessed.  Id.  For
purposes of calculating the number of firearms that a defendant
possessed, the Sentencing Guidelines incorporated § 5845's
definition of "firearm."  Id.  In calculating Blackburn's
sentence under the guidelines, the district court counted the
twenty-eight grenades that did not contain explosive powder as
firearms in Blackburn's possession.  Id.

17

On appeal, the Fourth Circuit concluded that the district court had erred in including the 28 grenades when calculating Blackburn's sentence.  Id. at 110.  In doing so, the court framed the relevant legal question as "whether a person can be deemed in possession of a 'destructive device' if he does not possess one of the requisite parts or ingredients needed to activate the device."  Id.  The Fourth Circuit answered that question in the negative.  Citing Malone, it concluded that "[a] defendant must possess every essential part necessary to construct a destructive device."  Id.

Likewise, in United States v. Osuna, 189 F.3d 1289 (10th Cir. 1999), a defendant appealed the calculation of his sentence, arguing that the district court had incorrectly counted nine inert grenades as firearms in his possession under the Sentencing Guidelines.  Id. at 1294.  The government conceded that the inert grenades should not have been included, and the Tenth Circuit agreed.  Id. at 1295.  Quoting Blackburn, the Tenth Circuit concluded that "'[i]nert' hand grenades, by definition, are not 'destructive devices' nor can they be 'readily assembled' into 'destructive devices.'"  Id.[3]

---

[3] The court in Osuna did not explain why the grenades were "inert."

The government argues that Malone and Blackburn are not applicable here because they were decided under, § 5845(f)(3), the "combination of parts" subsection, not § 5845(f)(1). Subsection 5845(f)(3) provides that disassembled parts may only be deemed a destructive device if they are a combination of parts "from which a destructive device may be readily assembled."  Accordingly, the Blackburn and Malone courts both considered whether a fully assembled device containing the parts that the defendant possessed would constitute a "destructive device" under the NFA, which is the same issue raised in construing § 5845(f)(1).  Therefore, the court concludes that the holdings in Malone and Blackburn, that a destructive device must contain certain essential components, also applies to cases under § 5845(f)(1).

It is correct, as the government points out, that Blackburn and Malone concluded that explosive material, not a detonation mechanism, was an essential component of a destructive device. In both Malone and Blackburn, however, the courts reasoned that the devices were not destructive devices because explosive material was one of the essential components of a destructive device.  Malone, 546 F.2d at 1184 ("[T]he defendant cannot be guilty of the offenses charged because he did not have in his possession all of the component parts from which a destructive

19

device might be readily assembled."(emphasis added)); Blackburn, 940 F.2d at 110 ("A defendant must possess <u>every</u> essential part necessary to construct a destructive device.").  Given that a grenade's only function is to explode, it follows that a mechanism for detonating the device is also an essential part of an "explosive grenade" under the NFA.[4]

Recently, a judge in this district applied similar reasoning in concluding that grenades containing inoperable fuzes are not destructive devices under § 5845(f)(1).  In <u>United States v. McLarnon</u>, 15-cr-00212-SM-1, the defendant, who was charged with two counts of receiving an unregistered firearm under § 5861(d), moved for judgment of acquittal, arguing that the evidence at trial demonstrated that the devices—which were grenades altered in similar fashion to those at issue here— contained inoperable fuzes and therefore could not readily detonate.  See <u>McLarnon</u>, Motion for Rule 29 Judgment (doc. no. 121).[5]  Based on that evidence, the defendant asserted that the

---

[4] The <u>Blackburn</u> court framed the legal issue that it was deciding as "whether a person can be deemed in possession of a 'destructive device' if he does not possess one of the requisite parts or ingredients <u>needed to activate the device</u>.'" Blackburn, 940 F.2d at 110 (emphasis added).

[5] As Leblanc acknowledges in his affidavit, the altered grenades in both <u>McLarnon</u> and this case come from the same batch of six grenades with inert fuzes that he received from the FBI's Explosives Unit in Quantico, Virginia.  See doc. no. 75-1 at ¶¶ 2-3.

devices were not destructive devices under the NFA.  Id.  The
court granted the defendant's motion, concluding that the
grenades were not destructive devices.  See McLarnon, oral
order, docket entry 1/29/2018.

In support of its different interpretation, the government
argues that several circuit courts have rejected the idea that a
device must be operable to qualify as a destructive device under
the NFA and other statutes with similar definitions of
"destructive device."  See doc. no. 75, pp. 8-9.  In each of
those cases, however, even though the device could not explode
as designed, the government offered evidence that the device at
issue was capable of exploding on its own without additional
parts.[6]  Accordingly, the cases cited by the government do not

_____

[6] See United States v. Sheehan, 838 F.3d 109, 118 (2nd Cir.
2016) (upholding conviction because jury could have relied on
expert testimony "that the device could be detonated in some
manner, such as by dropping the device or by unscrewing the end
cap" and observing that other circuits "have held that the
touchstone of whether a device an 'explosive bomb' is simply
whether the bomb is capable of exploding"); United States v.
Unthank, 107 F. App'x 625, 629 (6th Cir. 2004) (upholding
conviction because, in part, "according to trial testimony that
the jury was free to credit, the device did in fact explode,
although not with the high pressure fragmentation commonly
associated with fragmentation grenades"); United States v.
Langan, 263 F.3d 613, 625-26 (6th Cir. 2001) (affirming
conviction because device "was capable of explosion by being
thrown or dropped" and initiation circuity could have been
achieved merely by stripping wires already on device); United
States v. Evans, 526 F.2d 701, 707 (5th Cir. 1976) (expert
testified that dynamite, which did not detonate originally,

stand for the proposition that a device that cannot explode in and of itself is nevertheless a destructive device under the NFA.  Instead, in those cases, the devices were capable of exploding without additional parts and therefore qualified as destructive devices.

The government also asserts that it need not demonstrate that the grenade was capable of exploding because courts have "consistently held that 'operability' is not a required element in other firearm cases."  Doc. no. 75 at 11-13.  In support, the government argues that courts have instead assessed whether a device was designed to be a firearm.  Id. at 13.  The cases on which the government relies interpreted different provisions of federal law, which define a firearm broadly to include devices "designed to" shoot or expel a projectile.[7]  While Congress used

---

could have done so if given the opportunity to dry); United States v. Kiliyan, 456 F.2d 555, 557 (8th Cir. 1972) (expert testified that device at issue could have exploded if it had been thrown or if the tape "band aid" in the device had been removed).

[7] See United States v. Pena-Lora, 225 F.3d 17, 31-32 (1st Cir. 2000) (interpreting 18 U.S.C. § 921(a)(23) and observing that the statute "broadly defines 'machinegun' as 'any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading." (emphasis in original)); United States v. Alston, 112 F.3d 32, 34 (1st Cir. 1997) ("The pertinent federal definition of a firearm is more expansive than the Massachusetts definition: It includes 'any weapon which is designed to expel a projectile by the action of an explosive.' 18 U.S.C. § 921(a)(3)." (alterations omitted)); United States v. Veilleux,

similar language—"designed to shoot" or "designed"—when defining other subcategories of weapons in the NFA, Congress did not employ that language when defining what qualified as a destructive device under § 5845(f)(1).  Cf. 26 U.S.C. § 5845(b), (c) & (d) with § 5845(f).  Congress's decision not to use similar language in its description of "destructive device" in § 5845(f) shows that Congress did not intend that the mere design of a device be sufficient to render it a "destructive device" for purpose of the NFA.[8]

Accordingly, the court concludes that to qualify as an "explosive grenade" under § 5845(f)(1) a device must in and of itself be capable of exploding.  Here, it is undisputed that the FBI replaced the fuzes in the grenades Musso received with inert fuzes.  Because the government does not dispute that these devices were incapable of exploding on their own, without the

---

40 F.3d 9, 11 n.1 (1st Cir. 1994) ("The statute, 18 U.S.C. § 921(a)(3), . . . states, "The term 'firearm' means (A) any weapon ... which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."); United States v. Kirvan, 997 F.2d 963, 966 (1st Cir. 1993) (assessing adequacy of evidence that gun was a firearm for purposes of 18 U.S.C. § 924, which uses definition of firearm in 18 U.S.C. § 921(a)(3)).

[8] § 5845(f)(3) provides that "any combination of parts . . . designed . . . for use in converting any device into a destructive device as defined in subparagraph (1)" qualifies as a destructive device, but only if it is a combination "from which a destructive device may be readily assembled."  Id. (emphasis added).

aid of some other detonating device, they are not "explosive grenades" under § 5845(F)(1).  Therefore, the court concludes that the devices Musso received are not destructive devices or firearms under the NFA.

Musso's motion to dismiss Counts I-IV is granted.

### Conclusion

For the foregoing reasons, the defendant's motion to dismiss (doc. no. 72) is granted as to Counts I-IV and denied as to Count V.  The clerk shall schedule a final pretrial conference with counsel.

SO ORDERED.


_____
Joseph A. DiClerico, Jr.
United States District Judge


March 9, 2018

cc:   John S. Davis, Esq.
      Penny Sue Dean, Esq.
      Matthew Hunter, Esq.
      Mark L. Sisti, Esq.