UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   16-CR-33-01-JD
            v.                  *   April 22, 2019
                                *   2:15 p.m.
   DANIEL E. MUSSO, SR.         *
                                *
* * * * * * * * * * * * * * * * *


TRANSCRIPT OF CHANGE OF PLEA HEARING (DAY ONE)
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


APPEARANCES:


For the Government:      John S. Davis, AUSA
                         Matthew Hunter, SAUSA
                         U.S. Attorney's Office




For the Defendant:       Penny Sue Dean, Esq.
                         Law Office of Penny S. Dean




Court Reporter:          Susan M. Bateman, LCR, RPR, CRR
                         Official Court Reporter
                         United States District Court
                         55 Pleasant Street
                         Concord, NH 03301
                         (603) 225-1453

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  The Court has before it for
 3   consideration today a change of plea in criminal case number
 4   16-CR-33-01-JD, United States of America versus Daniel Musso.
 5              (Deputy clerk swears in the defendant)
 6              THE CLERK:  Would you please state your name for
 7   the record and spell your last name.
 8              THE DEFENDANT:  Daniel E. Musso.  Last name is
 9   spelled M-U-S-S-O.
10              THE COURT:  All right.  We are here for Mr. Musso's
11   entry of a guilty plea.
12              Why don't counsel identify themselves for the
13   record and we'll proceed.
14              MS. DEAN:  Yes, your Honor.  Penny Dean.  I
15   represent Daniel Musso seated to my left.
16              THE COURT:  Good afternoon.
17              MR. DAVIS:  John Davis for the government.
18              MR. HUNTER:  Matthew Hunter for the government.
19              THE COURT:  And who's with you?
20              MR. DAVIS:  Special Agent Shayne Tongbua for the
21   FBI, your Honor.
22              THE COURT:  All right.  Mr. Musso, I've got here a
23   plea agreement that goes along with a superseding indictment.
24   The plea agreement is 13 pages long.  It's signed by the
25   prosecutor, Mr. Davis, and your counsel, Ms. Dean, and
```

1    there's a signature line that says Daniel E. Musso, Sr.

2            Did you sign this?

3            THE DEFENDANT:  Yes, I did.

4            THE COURT:  All right.  Did you understand it when

5    you signed it?

6            THE DEFENDANT:  I did.

7            THE COURT:  All right.  Did you go over it

8    carefully with Attorney Dean before you signed it?

9            He can be seated.  You can be seated.

10           Did you go over it carefully with Attorney Dean?

11           THE DEFENDANT:  Yes, I did.

12           THE COURT:  Are you satisfied with the work

13   Attorney Dean has done for you on this case and her advice

14   and her counsel?

15           THE DEFENDANT:  Yes, I am.

16           THE COURT:  Okay.  Ms. Dean, why don't you tell me

17   what you did to go over this with your client.  Describe to

18   me exactly how you went over it with him.

19           MS. DEAN:  Yes, your Honor.  I don't have my

20   billing records here, but I would say we spent two hours,

21   maybe three hours.

22           THE COURT:  Sure.

23           MS. DEAN:  And I literally read it page by page and

24   discussed it along the way and some things -- there was one

25   portion I did not read, which was the portion 11, and it

1    starts out, "For people who are not United States citizens."

2              THE COURT:  I see.

3              MS. DEAN:  And Mr. Musso stopped me -- without

4    waiving any other privilege, Mr. Musso stopped me right away

5    and said he's a United States citizen.  I read the two or

6    three paragraphs there.  They clearly pertain to those who

7    are in my opinion not United States citizens.  So I did not

8    read that one line by line, word by word, period by period.

9    The other parts I absolutely did.  I did not that one.

10             THE COURT:  I appreciate that thorough answer.

11   Thank you.

12             Is that true, sir?

13             THE DEFENDANT:  Yes, it is.

14             THE COURT:  All right.  Ms. Dean, did you describe

15   to your client the nature of these charges, what they're

16   about, and how they're proven in court?

17             MS. DEAN:  Yes, your Honor, I did.

18             THE COURT:  Is that true?

19             THE DEFENDANT:  Yes.

20             THE COURT:  And did you explain any defenses that

21   he may have if he wanted to challenge this prosecution?

22             MS. DEAN:  Absolutely.  I think there's a lot of

23   defenses, and yes, I did.

24             THE COURT:  Is that true?

25             THE DEFENDANT:  Yes.

1              THE COURT:  All right.  You think there's a lot of

2      defenses?

3              MS. DEAN:  I do.

4              THE COURT:  All right.  Well, I guess we're going

5      to have to have a conversation about that at this point --

6      not at this point but at some point in the colloquy because

7      -- I mean, one thing that's important to the Court is --

8      people plead guilty for a lot of different reasons, but I

9      don't generally accept a guilty plea from someone who's not

10     actually really guilty.

11             So if there are defenses that would actually prove

12     his innocence or that would prevent the prosecution from

13     proving its case, I'm going to want to hear you tell me about

14     that at some point, okay?  Not right now, but we'll get to

15     it.

16             MS. DEAN:  Okay.  When you ask a direct question,

17     I'm going to have a direct answer and I'm going to answer

18     with a very heavy heart.  I have never been in the situation

19     that I'm in today.

20             THE COURT:  All right.

21             MS. DEAN:  And I struggled with this for the past

22     couple of months.  One of the things that lawyers -- I

23     thought, well, what if in the plea colloquy you ask me this

24     type of question, and then I stepped back and I remembered

25     one of the things that -- you can't play technical with the

1   judge, you know what I'm saying, like when your mom said to

2   do the dishes and you didn't do the silverware, you knew darn

3   well that she meant you had to do the silverware too.

4          So there be a point where I will have to

5   disclose some uncomfortable information, and I thought about

6   it and discussed it with my client and he knows that I'm

7   going to do this.  I believe it's the right thing to do, your

8   Honor.

9          THE COURT:  Well, we'll cross that bridge when we

10  come to it.  I'll try to ask direct questions.  You give me

11  direct answers.  But if there's something you want to say,

12  please don't hesitate.  Do you understand?

13          MS. DEAN:  Yes, your Honor.

14          THE COURT:  All right.

15          Okay.  Mr. Musso, given that your counsel has been

16  over this agreement with you and you're satisfied with her

17  work on the case, she's explained to you the nature of the

18  charges and any defenses that you may have, I want to conduct

19  this proceeding so you can enter the plea that you've agreed

20  to enter.

21          I'm going to have to ask you some questions.  It

22  will be on the record.  Everything we say is being typed and

23  recorded so you have to answer out loud, which you're already

24  doing.

25          You understand that, right?

1          THE DEFENDANT:  Yes.

2          Yeah, I do have a question.  Penny -- Ms. Penny

3     Dean sent me an e-mail about the plea, and there was a

4     misunderstanding or a mix-up.  Did that get straightened out?

5          THE COURT:  That's probably a conversation you want

6     to have with her, not with me.

7          MS. DEAN:  Yes.

8          THE COURT:  Do you want to take a recess?

9          MS. DEAN:  I don't think so, your Honor, right now.

10          THE COURT:  All right.  Did it get straightened

11     out?

12          MS. DEAN:  It did not, your Honor.  I don't think

13     it was substantive.  I think it was maybe an honest

14     misunderstanding, and I don't think it makes a difference of

15     what's before the Court.

16          I'm a technical accuracy freak so it did to me, but

17     I thought about it and I thought I can live with that.  I

18     don't think it makes any difference to Mr. Musso's situation,

19     and I don't believe that there was bad faith there.  I think

20     we may have just had a misunderstanding.

21          THE COURT:  All right.  Well, I'm going to take a

22     two minute recess to allow you to talk it over with him

23     because he obviously has a question.  So I'll take a brief

24     recess.  As soon as the deputy clerk tells me you're ready to

25     go, I'll come back out.

1          (RECESS)

2          THE COURT:  All right.  Before the recess I asked

3  you if you had any questions, Mr. Musso, and it appeared that

4  you had a question for your attorney, not so much the Court.

5          Did you get that resolved?

6          THE DEFENDANT:  I did, your Honor.  Yes.

7          THE COURT:  Thank you.  Okay.

8          The second point I wanted to make was that if I ask

9  you any questions today that sound like legalese or confusing

10  in any way, don't just answer them yes, yes, yes, or no, to

11  get it over with.  Ask me to explain it or ask Ms. Dean to

12  explain it.  We'll take all the time you need.

13          As you just found out, if you ever want to speak to

14  her outside of my presence or outside of our hearing, you can

15  do that anytime you want.  Do you understand?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Finally, tell the truth.  The Court is

18  entitled to truthful answers to all of these questions.  And

19  if you give an answer that's untrue, it could be used against

20  you in this case or in some other case, a whole separate

21  criminal prosecution for false statements or for perjury.

22  You obviously don't want that.  So please make sure your

23  answers are truthful.  Do you understand?

24          THE DEFENDANT:  Yes.

25          THE COURT:  All right.  Tell me about yourself,

sir.  How old are you?

THE DEFENDANT:  I just turned 58, sir.

THE COURT:  All right.  58 years old.  Are you married?

THE DEFENDANT:  I am single.  Divorced.

THE COURT:  Any children?

THE DEFENDANT:  Yes, I do.  I have two grown boys.  I have five grandchildren.

THE COURT:  So your kids are grown?

THE DEFENDANT:  Yes.

THE COURT:  Your dependents are out of the house?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Your education?

THE DEFENDANT:  I never finished high school, but I took my GED and I completed that.

THE COURT:  So you read and write English perfectly?

THE DEFENDANT:  No.  I have a hard time comprehending stuff.  I'm a little behind.  I took an equivalency test on like a sixth grade education.  Sometimes I have to just read it, read it, absorb it, and then I reread it.

THE COURT:  That's a good answer.

Mr. Davis, I'm going to have you make an actual proffer rather than just relying on the written plea

1    agreement, okay?

2                Have you ever been addicted to drugs or alcohol?

3                THE DEFENDANT:  Alcohol, yes.

4                THE COURT:  Okay.  Are you in any kind of recovery

5    for alcoholism?

6                THE DEFENDANT:  I'm going to stand, your Honor.

7                When all this took place, I had been drinking since

8    I was 14 years old.  Anytime I ever got in trouble it was

9    alcohol abuse.

10                When I got thrown in the clink, I sat down and I

11   said there's something wrong.  So I took every class I could

12   and rehabilitated myself, and I learned a lot.

13                I have been sober for three years now, and I hit

14   rock bottom.  I'll never touch a drop of alcohol again.  I

15   can thank God for that.

16                They have a lot of good programs in Strafford

17   County, and I took advantage of them many times.  As a matter

18   of fact, they talked that they want me to go back when I'm

19   settled in.  When all this is completed, they want me to come

20   back and speak to the classes for them because the teachers

21   noticed a big change in me, in my attitude, and a difference

22   in me, and they were just like, wow.  I've changed.  I'm a

23   changed person.

24                THE COURT:  All right.  You can be seated.

25                So obviously you're not under the influence of any

1    alcohol right now?

2             THE DEFENDANT:  No.  I'm three years sober, your

3    Honor, and proud of it.

4             THE COURT:  All right.  What about drugs?  Any drug

5    problems?

6             THE DEFENDANT:  None at all.

7             THE COURT:  All right.  Are you on any kind of

8    medication from a doctor?

9             THE DEFENDANT:  None at all.

10            THE COURT:  Prescription medication?

11            THE DEFENDANT:  None at all.

12            THE COURT:  How about prescription medication that

13   you should be taking but you're not taking?

14            THE DEFENDANT:  No.  Not to my knowledge.

15            THE COURT:  All right.  Have a seat.  Very good.

16            Have you ever been diagnosed with any kind of

17   mental illness or disorder; bipolar, depression, anxiety

18   disorder, anything like that?

19            THE DEFENDANT:  Not to my knowledge.

20            THE COURT:  Okay.  So you've never been prescribed

21   any medication for that?

22            THE DEFENDANT:  No, sir.

23            THE COURT:  Okay.  All right then.

24            This offense you've been charged with, you've been

25   indicted for, it's called receiving an unregistered firearm.

1          Now, it has four elements.  First of all, the first

2    element is that you knowingly received or possessed a

3    firearm, the one described in the indictment.

4          The second element is that the firearm in this case

5    was an explosive grenade.  We don't really think of grenades

6    necessarily as a firearm, like a rifle or a shotgun, but

7    under federal law they are defined as firearms.  Understand?

8          THE DEFENDANT:  Yes.

9          THE COURT:  That's correct, right, Mr. Davis?

10         MR. DAVIS:  Yes, your Honor.

11         THE COURT:  All right.  Now, you knew that the

12   grenade that you possessed or received was a grenade, that's

13   the third element; and fourth, that that firearm, that

14   grenade, was not registered to you in the National Firearm

15   Registration and Transfer Record.

16         Those are the elements.  You got it?  It's you

17   knowingly possessed or received a firearm, which in this case

18   was a grenade, and that you knew it was a grenade but that it

19   wasn't registered to you in the appropriate registry

20   maintained by the federal government.  Do you understand?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Okay.

23         I'm going to ask the prosecutor now to tell me what

24   happened here.  He's going to describe for me -- I've read

25   it, but I'm going to have him tell me verbally because you

1   told me you're having a little difficulty reading, so I want

2   to make sure you're listening to it.  Listen to everything he

3   says because when he's done speaking, I might have some

4   questions for you about what he says.  All right?  Is that

5   okay?

6              MR. DAVIS:  Your Honor, Mr. Hunter is prepared.

7              THE COURT:  AUSA Hunter, please proceed.

8              MR. HUNTER:  Thank you, your Honor.

9              If this case proceeded to trial, the government

10  would introduce evidence of the following facts which could

11  prove the evidence that the Court just enumerated beyond a

12  reasonable doubt:

13             In approximately July 2015, the defendant, Mr.

14  Musso, met with the owner of a firearms store in Chichester,

15  New Hampshire.  During that meeting the defendant provided

16  the store owner with a handwritten list of items that he

17  wanted to purchase, which included ammunition as well as

18  grenades.  On November 8, 2015, the defendant paid the store

19  owner $6,000 in cash to acquire the items on his list.

20             In a recorded meeting on December 12, 2015, the

21  store owner provided the defendant with some of the

22  ammunition from his list and requested that the defendant

23  write on the back of his list items he wished to acquire with

24  the remainder of his deposit.

25             Among the items listed were grenades-6.  When the

owner asked the defendant to tell him what he wanted, the

defendant referred to a half dozen of them special things and

then in the course of the conversation clarified that he was

referring to hand grenades.  The store owner said that he

would see what he could do about getting the hand grenades

and would talk to an Army buddy.

On July 15, 2016, during another recorded meeting

with the store owner, the defendant discussed how he could

get hand grenades.  The store owner told the defendant the

guy has them, I can introduce you to them, but that he can't

do it here because of what he is.  He and the defendant

agreed that the store owner would set up a meeting.

On January 22, 2016, the defendant met at the

firearms store with an undercover agent posing as an illegal

weapons dealer.  During the meeting the defendant asked the

undercover agent, did he tell you what I'm looking for.  To

confirm the defendant's order, the undercover agent showed

the defendant colored photographs with M67 military

fragmentation grenades and said those are frags.  He then

asked the defendant how many he wanted.  The defendant

replied half a dozen of them.  The defendant and the

undercover agent negotiated a price of $150 per grenade or

$900 for the six grenades.

The defendant provided the undercover agent with

his e-mail address and agreed to meet Wednesday, January 27,

1    2016, in the late morning at the Seabrook, New Hampshire,

2    rest area to pick up his order.

3           On January 27th the defendant met the undercover

4    agent at the Seabrook, New Hampshire, rest stop.  The

5    undercover agent told the defendant that he had only four

6    grenades, not the six that they had previously agreed.  They

7    agreed on a price of $600 for the four grenades, and the

8    undercover agent said that he would provide the defendant

9    with the two remaining grenades at a later date.

10          The undercover agent showed the defendant one of

11   the four military fragmentation grenades and showed the

12   defendant how it worked and that there were four of them.

13   The defendant then took a bag that contained all four M67

14   fragmentation grenades.  After the transaction, as he was

15   walking back to his car with the grenades, the FBI arrested

16   the defendant.

17          THE COURT:  Slow down a little bit for the

18   reporter.

19          MR. HUNTER:  Oh, I apologize, your Honor.

20          THE COURT:  It's a bad habit, I have the same one,

21   but take it easy just a little bit.

22          MR. HUNTER:  The FBI had obtained each of these

23   four M67 fragmentation grenades that the defendant received

24   from the Marine Corps in Quantico, Virginia.  Each M67

25   grenade was manufactured for use by soldiers in combat.  Each

1    grenade received by the defendant contained Composition B

2    high explosive and was fitted with an inoperable fuse.  Each

3    grenade the defendant received remained armed with its

4    original explosive charge of Composition B which could be

5    made to explode by, for example, replacing the inoperable

6    fuse with an operable one, by using a commercial or a

7    homemade detonator, or by a sufficient impact.  None of the

8    grenades were registered to the defendant in the National

9    Firearms Registration.

10              THE COURT:  Thank you, sir.

11              MR. HUNTER:  Thank you, your Honor.

12              THE COURT:  All right.  Mr. Musso, did you hear

13   what the prosecutor said?

14              THE DEFENDANT:  Yes.

15              THE COURT:  Was it all true?

16              THE DEFENDANT:  Yes.

17              THE COURT:  All right.  Now, I want to talk to you

18   about the penalties you face for this offense.

19              First of all, this is a felony offense so it's

20   going to be on your record the rest of your life.  There's no

21   device in federal law -- or no vehicle in federal law for

22   removing something from your criminal record.  So it will be

23   on your record the rest of your life unless you're pardoned

24   by the President of the United States, which is probably not

25   going to happen.  Do you understand?

1          THE DEFENDANT:  Yes.

2          THE COURT:  You've got to answer out loud for the

3     record.

4          THE DEFENDANT:  Oh, I'm sorry.

5          THE COURT:  No problem.

6          Secondly, you can lose rights and entitlements and

7     benefits that are available to most citizens, depending on

8     where they live, for being a convicted felon.  You can lose

9     the right to vote, the right to run for office or hold

10    office, the right to sit on a jury, the right to own a

11    firearm, these can all be lost, as well as entitlements to

12    certain programs, educational programs, benefits,

13    occupational benefits, lots of different things, residential

14    benefits, based on being a convicted felon.

15         Do you understand that?

16         THE DEFENDANT:  Parts of it I do.  I don't

17    understand the whole -- I understand what you just said, but

18    I'm sure there's other things that I'm not aware of.

19         THE COURT:  Probably.  There's probably many.

20         What I'm trying to tell you is there's consequences

21    that go beyond the sentence I'm going to impose.

22         For example, suppose you want to live in federally

23    subsidized housing somewhere and you applied to live in

24    housing and they found you had a felony record.  In some

25    places they would say, sorry, no, you can't live here.  You

have a record.

There might be some jobs you apply for that --
never mind employers who just weren't willing to hire you,
but there are some occupations that are not permitted to hire
you.  Things like that, benefits, entitlements, all kinds of
things that I can't list all today, and your counsel couldn't
either.  I just need you to understand there are consequences
to this that go beyond the sentence.

Do you understand?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  Finally, the sentence.  The
sentence could be up to ten years imprisonment, first of all.

Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  A maximum fine of $10,000.

Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  There will be a $100 charge.  It's like
an assessment.  In every case it's part of the sentence.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Will there be any
forfeiture in this case?

MR. DAVIS:  No, your Honor.

THE COURT:  Restitution?

1          MR. DAVIS:  No.

2          THE COURT:  All right.  No forfeiture.  No

3     restitution.

4          You're an American citizen so there will be no

5     immigration consequences.

6          There's one other thing, though.  It's called

7     supervised release.  Supervised release is kind of like being

8     on parole from prison, but it's a little bit different.

9          First of all, there is no parole in the federal

10    system.  If you're sent to prison, you'll have to serve the

11    whole sentence.  You won't be sent home early on parole.

12          Do you understand that?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Secondly, when you're released from

15    prison, you live under a certain status called supervised

16    release.  There's a set of written rules and conditions.  You

17    have to live under them and obey them.  You're supervised by

18    a United States probation officer.  That's how it works.

19    Now, in this case it can be up to three years supervision.

20          If you follow the rules, after the period of

21    supervision it's over.  You're no longer under supervision.

22    You're no longer on supervised release.  If you violate the

23    rules, however, your supervised release status can be revoked

24    and you can be sent back to prison, and you might not get any

25    credit for your good street time, the time you complied with

1  the rules.  You might not get any credit for that.  And in

2  fact, you can even be sent to prison for longer than you were

3  the first time just for violating the rules of supervised

4  release.

5              Do you understand that?

6              THE DEFENDANT:  Yes, I do.

7              THE COURT:  All right.  Those are the consequences

8  of a guilty plea.  Any questions?

9              THE DEFENDANT:  No, your Honor.

10             THE COURT:  I'm happy to answer anything you have.

11             Okay.  Now, let's talk about how federal sentencing

12  works a little bit.

13             When I impose sentence in this case, I'll be

14  advised by what are called the U.S. sentencing guidelines.

15             Have you talked about these guidelines with Ms.

16  Dean and how they affect your case, the U.S. sentencing

17  guidelines?

18             THE DEFENDANT:  Yes.

19             THE COURT:  All right.  You've talked about it?

20             THE DEFENDANT:  We've touched base on it, yes.

21             THE COURT:  Good.  Now, these guidelines will make

22  a recommendation in your case.  They make a recommendation in

23  every case, usually a period of months' imprisonment and some

24  other things, the fine, et cetera.

25             I don't have to follow the guidelines.  I do have

1    to consult with them and be advised by them, but I don't have

2    to impose the sentence that the guidelines recommend.  I

3    could impose a sentence that's more lenient or I could impose

4    a sentence that's more severe.

5              Do you understand?

6              THE DEFENDANT:  Yes.

7              THE COURT:  All right.  Now, I do have to figure

8    out what the guidelines recommend in every case.  One of the

9    tools that I will use to do that is called the presentence

10   report.  That's a report written by a U.S. probation officer.

11   After the officer interviews you and does an investigation of

12   you and your crime, that officer will write a report called

13   the presentence report.  I'll read it very carefully.

14             You can object to anything in that report you

15   disagree with.  So can the prosecutor.  Both of you can

16   object both to the probation officer and to the Court.  You

17   can object to lots of different things, the facts that are

18   found in the report, how the law is applied in the report,

19   recommendations in the report, guideline calculations.

20   Anything you don't agree with, you can object.  Do you

21   understand?

22             THE DEFENDANT:  Yes, I do.

23             THE COURT:  All right.  But, and you have to

24   remember this, disagreeing with that report or how I

25   interpret it doesn't give you the right to take back your

1    guilty plea.  You can't withdraw your guilty plea because of

2    what the report says or because how I interpret it.

3                Do you understand?

4                THE DEFENDANT:  Yes.

5                THE COURT:  All right.  Now, let's talk about your

6    plea agreement.  I've read this carefully.  Here's how I

7    understand it.  It's like any other agreement.  You've made

8    an agreement with the U.S. government here.  You've exchanged

9    promises.  You've promised to do some things like plead

10   guilty, which you're doing right now.  That's happening as we

11   speak.  You've promised that the facts set forth in this plea

12   agreement are true and accurate.  That they can be proven in

13   court beyond a reasonable doubt.

14               Do you understand?

15               THE DEFENDANT:  Yes, I do.

16               THE COURT:  All right.  You've made some agreements

17   about the sentence in the case.  First of all, the guideline

18   system that we've talked about, that has a number of

19   different components to the way it works.  It basically

20   imposes a sentence -- strike that.  It recommends a sentence.

21   It doesn't impose a sentence.  It recommends a sentence based

22   on two factors.

23               The first factor is how serious the crime was.

24   It's called the offense level.  It's on a scale of 1 to 43.

25               The other factor is your record.  How bad your

1  record is.  How serious your record is.  That's assessed on

2  categories I to VI.

3          Based on those two things it makes a recommendation

4  which again, as I told you, I don't have to follow but I do

5  have to determine.

6          Now, you've made some agreements about that.  First

7  of all, you've agreed -- the prosecution has agreed you

8  should get some leniency in this case, some credit for

9  accepting responsibility, for admitting what you did, all

10 right?  That might be two levels.  It might be three levels.

11 It depends how the case goes.  But the government says you're

12 entitled to that unless -- if you look at this plea agreement

13 on page 7, there's a list of things, A through J.  If you do

14 any of those things, that means you've breached the plea

15 agreement and you're not entitled to the acceptance of

16 responsibility credit.

17          Do you understand?

18          THE DEFENDANT:  Yes, I do.

19          THE COURT:  All right.  That's one agreement you've

20 made.

21          Another agreement you've made is how the guidelines

22 will work, or, more specifically, how the prosecution will

23 approach the guidelines in this case.

24          For example, the government will make a

25 recommendation within the guideline sentencing range.  I'll

1  just make up a number right now.  And I have no idea if this

2  is even close to the number in this case.  Suppose it was 36

3  to 42 months.  The government's recommendation would be in

4  that range.  They won't recommend higher.  They could

5  recommend lower, and you wouldn't mind that, but they're not

6  going to recommend higher than that range.

7          Do you understand?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Okay.  And they made no promise to make

10 anything lower than that range, just to recommend the range.

11 That's number one.

12         Number two, it will not seek an upward departure or

13 variance.  That means it's not going to make the request of

14 me, the Court, to sentence you more severely than what that

15 initial guideline sentencing range recommends for any reason.

16         Do you understand?

17         THE DEFENDANT:  Yes.

18         THE COURT:  And, all right, if you comply with the

19 conditions of release after entering the guilty plea, the

20 prosecution will not oppose allowing you to report to prison

21 the day that I select rather than just being taken away at

22 the sentencing hearing or today.

23         Do you understand?

24         THE DEFENDANT:  Yes.

25         THE COURT:  All right.  It just means that if you

1    follow the rules the way you've been following them up till

2    now, they won't object if I want to order you to report to

3    prison on a different day.  That's all.

4           Look, the fact is on some cases I would just order

5    you detained today.  In some cases the day of sentencing you

6    would just be taken into custody.  This means you might get a

7    little extra time to prepare.  It looks like you're running a

8    business and it looks like you've been following the rules.

9    That doesn't seem like a bad idea to me based on what I know

10   now, but I can't make any promises right now.

11          Do you understand?

12          THE DEFENDANT:  Yes.

13          THE COURT:  All right.  The only other thing that I

14   think is significant enough to talk about in this agreement

15   is that you're giving up some rights to challenge this case.

16   Normally in a criminal case you can challenge it.  Even when

17   it's over you can challenge it.  When you challenge the case

18   after it's over, you can file a motion or a petition in this

19   court.  It's called a collateral attack.  You can also appeal

20   it to a higher court.  That's called an appeal.  Those types

21   of challenges, you're giving them up in this plea agreement.

22   You can't file a collateral attack and you can't file an

23   appeal.

24          You can file an appeal or an attack on the sentence

25   if it's higher than the guideline sentencing range.  That's

1   what this agreement says.  All right?

2             Do you understand that?

3             THE DEFENDANT:  I do.

4             THE COURT:  There's a couple other things you can

5   do.  You should know this.

6             If Attorney Dean rendered ineffective assistance of

7   counsel in some way, if her performance didn't rise to the

8   level required by the United States Constitution and it

9   affected your case, you could have a collateral attack or an

10  appeal based on that.

11            Do you understand?

12            THE DEFENDANT:  Yes.

13            THE COURT:  One other thing.  If the law changes --

14  suppose the law of firearms changes in some way in the future

15  that related back to today, to the law as it applied in your

16  case in a way that would have affected your case.  You might

17  be entitled to a collateral attack or an appeal based on

18  that.

19            Do you understand?

20            THE DEFENDANT:  Yes.

21            THE COURT:  All right.  That's really it as far as

22  I can tell.

23            Is there anything else, counsel?

24            MR. DAVIS:  No, your Honor.

25            THE COURT:  All right.  Ms. Dean?

1          MS. DEAN:  No, there is nothing else.

2          THE COURT:  All right.

3          Finally, you're giving up some constitutional

4    rights.  When you enter a guilty plea, you're giving up very

5    important rights guaranteed to you under the U.S.

6    Constitution.

7          First and foremost, you have the right to plead not

8    guilty instead of guilty.  Even though you already told me

9    what the prosecutor said was true and what the agreement says

10   is true, you don't have to admit it today if you don't want

11   to.  You don't have to plead guilty.  You can maintain your

12   innocence and persist in a not guilty plea you entered at

13   arraignment.

14          Do you understand?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Okay.  You have a right to a jury

17   trial.  Do you understand that?

18          THE DEFENDANT:  Yes.

19          THE COURT:  At a jury trial you would have the

20   right to the assistance of counsel.  Ms. Dean or someone like

21   her would conduct your defense or assist you in conducting

22   your own defense.

23          Do you understand that?

24          THE DEFENDANT:  Yes.

25          THE COURT:  You have the right to see and hear all

1  the evidence and witnesses presented against you and confront

2  them and cross-examine them in your defense.

3            Do you understand?

4            THE DEFENDANT:  Yes.

5            THE COURT:  You have a right called compulsory

6  process, and what that means is you have subpoena power,

7  power to subpoena to court evidence and witnesses to present

8  in your own defense.

9            Do you understand?

10            THE DEFENDANT:  Yes.

11            THE COURT:  You have the right to make up your own

12  mind at trial whether you want to testify or not, whether you

13  want to take the witness stand, answer any questions, offer

14  testimony, explain yourself in any way.  Nobody here can make

15  you do that.  That's your decision.

16            Likewise, if you want to take the witness stand,

17  nobody can stop you, not me, not your lawyer, not the

18  prosecutors.  The bottom line is the decision about whether

19  you take the witness stand and testify and answer questions

20  is your decision alone because it's your constitutional

21  right.

22            Do you understand?

23            THE DEFENDANT:  Yes.

24            THE COURT:  If you go to trial, you don't have to

25  prove you're innocent.  The prosecutor has to prove you're

1    guilty beyond a reasonable doubt with competent, admissible

2    evidence.  That means all four of those elements that we

3    talked about, that you received or possessed a firearm, that

4    the firearm in this case was a grenade, that you knew it was

5    a grenade, and that it wasn't registered to you with the

6    federal government, that would all have to be proven beyond a

7    reasonable doubt for you to be convicted.

8              Do you understand?

9              THE DEFENDANT:  Yes, I do.

10             THE COURT:  You also have a right to a unanimous

11   jury.  That means all twelve jurors in your criminal jury

12   would have to agree that each of those elements had been

13   proven beyond a reasonable doubt before you could be

14   convicted.

15             Do you understand?

16             THE DEFENDANT:  Yes.

17             THE COURT:  We've talked already about your right

18   to appeal.  You've given up your right to appeal in this plea

19   agreement unless the sentence is over the guideline

20   sentencing range.

21             However, the bottom line is by pleading guilty you

22   pretty much give up your right to appeal anyway because if

23   you went to trial and you were found guilty, you were

24   convicted, you would have an automatic appeal just for asking

25   to the U.S. Court of Appeals.  An appeal would mean that the

1    Court of Appeals would examine the records in the case and

2    listen to the lawyers on both sides to determine if there was

3    enough evidence to convict you, if the criminal law was

4    applied correctly in your case, if your constitutional rights

5    were honored in the trial, and if you received a fair trial.

6    All that would be fair game.  But when you enter a guilty

7    plea, you lose all of that.  You give up your right to

8    appeal.  That's what you're doing right now.

9            Do you understand?

10           THE DEFENDANT:  Yes.

11           THE COURT:  All right.  So as we've talked about

12   all these rights, these are all the rights that are attached

13   to a jury trial that you're giving up right now.

14           Do you understand that?

15           THE DEFENDANT:  Yes, I do.

16           THE COURT:  So if you give them up, there won't be

17   a trial and you'll have waived and given up all these rights.

18           Do you understand that?

19           THE DEFENDANT:  Yes.

20           THE COURT:  So thinking about and considering all

21   of these rights that we're talking about now, is it still

22   your wish to give them up by entering a plea instead of going

23   to trial?

24           THE DEFENDANT:  Yes.

25           THE COURT:  Tell me why.  You have a right to a

1  trial.  Why are you pleading guilty?

2          THE DEFENDANT:  I'm guilty.

3          THE COURT:  All right.  Fair enough.

4          Has anyone threatened you or tried to coerce you or

5  intimidate you into entering a plea?

6          THE DEFENDANT:  Not whatsoever.

7          THE COURT:  Has anyone made any promises to go easy

8  on you or be easier with you or be lenient in any way?  Aside

9  from what's in this written plea agreement I mean.  Is there

10 anything else that's not in writing that I don't know about?

11         THE DEFENDANT:  No, your Honor.

12         THE COURT:  If the plea is accepted, the only thing

13 that's going to be left in the case is going to be the

14 imposition of a sentence.  That might include federal prison.

15         Do you understand that?

16         THE DEFENDANT:  Yes, I do.

17         THE COURT:  All right.

18         Ms. Dean, has Mr. Musso said anything to you or

19 have you observed anything about him involving medication or

20 alcohol or drugs, or mental illness or disorder, or anything

21 at all that could be affecting his actions, his judgment, his

22 memory, or his ability to understand these proceedings today?

23         MS. DEAN:  There's nothing that affects his ability

24 to understand these proceedings today.

25         THE COURT:  Okay.  What about his ability to

1    control his actions today?  Is he in command of himself?

2              MS. DEAN:  Absolutely.  Absolutely.

3              THE COURT:  How about his judgment?  Is he

4    exercising sound judgment?

5              MS. DEAN:  He's making the choice that he's

6    choosing to make.

7              THE COURT:  I see.

8              MS. DEAN:  I don't think that he's under alcohol,

9    drugs, or any of those things.

10             THE COURT:  Let me just ask you it this way,

11   because it sounds to me like maybe you -- it sounds like

12   maybe you are not a hundred percent supportive of his

13   decision to enter a plea.  That's not the question.

14             My question for you is, do you have any doubt that

15   he's competent to enter a plea today?

16             MS. DEAN:  I don't think -- it's not a matter of my

17   position about whether or not he is to enter a plea.  I

18   believe that a statement made to him, at least according to

19   these ten affidavits I have, by a United States attorney that

20   they were going to break him and they were going to put him

21   down, that that entered into it.

22             That's where my heavy heart comes from.  When I

23   heard that that statement was made to him in a courtroom, I

24   was shocked.  I didn't hear it.  So I ordered the transcript

25   to see if it was caught at the end of the hearing.

1          I obtained affidavits from ten people who all

2    pretty much say the same thing.  And then when I asked them

3    further to identify which of the two United States attorneys

4    made the statement, I get two or three of them so far who

5    have identified the same person.  So I believe being told

6    we're going to break you and hang on to your wallet and you

7    will not have any money left, I believe that entered into it.

8    So I can't in good conscience not bring it to the Court.  I

9    believe Mr. Musso still --

10          THE COURT:  Well, I just asked him if anyone tried

11   to intimidate him, coerce him, or in any way force him to

12   enter a guilty plea, and he said no.

13          MS. DEAN:  But he doesn't -- and this is what I'm

14   bringing to your attention, and I'm not in any way

15   denigrating my client.  He has to -- regularly he has to look

16   up words, words like that, and those are very good words that

17   the Court is choosing, but he has trouble with his vocabulary

18   so I have asked him more than once when I use a word to tell

19   me if he doesn't understand what it means.

20          THE COURT:  Okay.  I'll explore this then.

21          But I'm asking you, you understand the concept of

22   competency to stand trial obviously.

23          MS. DEAN:  Yes.

24          THE COURT:  You understand the concept of

25   competency to enter a plea?

1          MS. DEAN:  Absolutely.

2          THE COURT:  Do you have any question that he's

3     competent to enter a plea today?

4          MS. DEAN:  None.

5          THE COURT:  Okay.  Thank you.

6          Now I'm going to ask you -- I'm going to go back to

7     you, Mr. Musso.

8          I asked you a few minutes ago whether you had been

9     basically intimidated in some way or coerced or forced in

10    some way to enter this plea; is your will being overborne in

11    some way.

12         It could be -- you know, there's lots of ways this

13    can happen.  It can be threats to family members -- by the

14    way, I'm not suggesting that this took place.  I'm just

15    asking.  There can be threats against you, your physical

16    well-being, your financial well-being, your family members,

17    lots of ways people can be intimidated, coerced, and forced.

18         I'm asking you right now man to man in this

19    courtroom, have you been in some way forced into entering

20    this plea?  Has your free will been overborne in any way?

21         THE DEFENDANT:  Well, let me say it in my words.

22         THE COURT:  Sure.

23         THE DEFENDANT:  I didn't know these letters had any

24    -- this stuff had anything to do with it, to this case.  I

25    don't know what's right and what's wrong in that aspect.

1          I'm at the end of my wallet.  I mean, I'm broke,

2     broken and broke.  I borrowed money to get to the point where

3     I'm at, and I'm pleading out.  I can't go any further.

4          THE COURT:  But you told me when I asked you a

5     minute ago why are you pleading guilty, and you said because

6     I'm guilty.  Is that true?

7          THE DEFENDANT:  Yes.  I am guilty, yes.

8          THE COURT:  All right.  And -- look, I'm sure the

9     prosecutors are going to have something to say about this,

10    and I'm going to give them an opportunity to say it, but

11    you've examined the evidence and you're convinced that you're

12    guilty.  I'm asking you, has somebody engaged in improper

13    conduct to overbear your will?  Have you been mistreated in

14    some way?  And I don't mean that you disagree with these

15    firearms laws.  I'm asking you in the context of this

16    proceeding, are you here pleading guilty today of your own

17    free will?

18         THE DEFENDANT:  Yes, I am.

19         THE COURT:  All right.  Thank you.

20         What do you want to say about this?

21         MR. DAVIS:  Your Honor, we had not heard this

22    allegation until today, nor were we aware of ten affidavits.

23         THE COURT:  Oh.

24         MR. DAVIS:  I'm not aware of someone threatening to

25    break Mr. Musso at around the time of his arrest.  I assume

1   that would have been -- neither Mr. Hunter nor I was in the

2   office at that time so we weren't eyewitnesses, but I'm

3   confident that none of my colleagues would have conducted

4   themselves in that way.

5            So we certainly object to the claim by Ms. Dean and

6   rather resent that it's being brought up now in these

7   circumstances, but that's her right, I suppose.

8            I would say that we have treated --

9            THE COURT:  It's probably her right.  I'm not sure

10  how sound a practice it is frankly.

11           I didn't know this was all news to the prosecution.

12  Don't get up yet.  I'll hear you on it.  I promise.  This is

13  a little irregular, but go ahead.

14           MR. DAVIS:  The government has treated Mr. Musso

15  and his counsel with scrupulous fairness and care.  I'm

16  satisfied of that.  Mr. Hunter has worked very hard on this

17  case.  We have prepared for trial the first time.  We have

18  provided complete discovery, which includes videotapes and

19  recordings of and transcripts of the conversations in this

20  case.  In my view this case is an overwhelming -- involves

21  overwhelming evidence of the defendant's guilt, which he's

22  admitted today.

23           THE COURT:  Is this the case that went up to the

24  circuit?

25           MR. DAVIS:  Yes.

1           THE COURT:  Oh.

2           MR. DAVIS:  And so, your Honor, the Court granted a

3    motion to dismiss.  And after further consultation which we

4    appealed to the First Circuit.  That necessitated a nine

5    month break or so, and the opinion came back.

6           Since then we've been dealing we think

7    transparently and fairly with Ms. Dean on every aspect of the

8    case.  We've been communicating carefully.  We have never

9    threatened anyone.

10          THE COURT:  I didn't understand Ms. Dean to be

11   suggesting that you committed any misconduct at all or your

12   co-counsel.  It sounds like there's -- I'm going to have to

13   talk about this a little bit more because I don't want to

14   conduct a proceeding that has, you know, a time bomb ticking

15   underneath it.  I understand your position.  Is there

16   anything else you want to say about it?

17          MR. DAVIS:  Only that as trial approached we made a

18   plea offer, we gave a time deadline of the plea offer, and we

19   talked with Ms. Dean further about it.  She talked to

20   probation.  Again, I'm satisfied that negotiations in this

21   case have not been coercive and have been careful and fair by

22   both parties.

23          THE COURT:  Understood.

24          MS. DEAN:  Your Honor, normally I would not comment

25   on discovery at this stage in the game, but because the

1  United States did, I feel the need to say something to the

2  Court.

3  I had to work extraordinarily hard and spend

4  extraordinary amounts of money asking for things I think Rule

5  16 allowed me to have to begin with, things like a Blu-ray

6  surveillance tape.  Just many things that literally I asked

7  for repeatedly when it was clearly an item that the

8  government had, and so I don't agree that everything was

9  handled scrupulously at all.  At all.

10  And just most recently I made my third request in

11  February, it was given to me in April, and it was something

12  that they have possessed since January of 2015 or '16.  I

13  forget the date of his arrest there so --

14  THE COURT:  But you've reviewed it now?

15  MS. DEAN:  I have.

16  THE COURT:  Does it suggest to you in any way that

17  your client shouldn't enter a plea or that he has an

18  available defense that you're not pursuing as he enters a

19  guilty plea?

20  MS. DEAN:  No, it doesn't, but I'm using that as an

21  example, your Honor, of one of the many things that had I

22  received it when I should have and asked in the beginning --

23  Milt Abrams, who is the confidential human source, payments

24  to him over time.  Again, that they had had since -- the man

25  has been a professional, if you will, I guess you would say

1    reporter since the '80s, according to the information I've

2    gotten from the government, and this is information, again,

3    of exact payments to him from 2013 before they had -- that I

4    had to repeatedly ask for.

5              So I guess my point is that -- again, I wouldn't

6    have brought up discovery, but because the government made

7    that point I want to make that point very clear that I don't

8    agree with that at all, and I've sent repeated letters to

9    them outlining my disagreement.

10             But more importantly -- and again, I've never been

11   in this situation before.  As I told the Court from the

12   beginning, I've never had this type of thing happen.  And so

13   the affidavits that I received were from -- the original ones

14   were from, I'm trying to see, February 5, 2019, which was

15   relatively recently when I really understood what these

16   people said had happened, and it happened -- when I say in

17   this courtroom, in this court building in another courtroom

18   after Mr. Musso's bail hearing.  And when I heard -- I said

19   I've got to find out what was said and who said it because I

20   didn't hear it said, and so I was pretty shocked, to say the

21   least.

22             So when you have ten people all willing to fill out

23   affidavits -- and then I said, well, it's not clear to me in

24   these affidavits which one of the two United States attorneys

25   allegedly said this, because you can't say there's two men

1      and someone said this.  You have to know which one said it.

2              So I followed up with more affidavits, and I have,

3      let's see, two or three more, and if you ask why they weren't

4      given to the state, they're dated April 20th and April 19th

5      and April 18th.  So because I asked further questions, I said

6      which one of the two men are you alleging said this.

7              THE COURT:  It's not so much that I wonder why you

8      didn't provide them to the U.S. Attorney.

9              My real question, and I say this with full respect,

10     I'm wondering why we're talking about it now because what I

11     want to know is -- I'm going to let you tell me all about

12     this as long as you want.  I will sit here the rest of the

13     day.

14             What I'm asking you right now is this question:  Do

15     you have any reason to think that there's any infirmity in

16     this man's entry of a guilty plea whatsoever or in the

17     underlying basis for this prosecution?

18             MS. DEAN:  I can't say the underlying basis because

19     I still don't have all the information I thought I needed.

20             I can say that Mr. Musso chooses to make his plea

21     entry --

22             THE COURT:  How am I to accept a guilty plea from a

23     citizen who has told me he's guilty when his lawyer is going

24     to stand in court and tell me that you don't have all the

25     information you need to make that assessment?

1          MS. DEAN:  That isn't what I said.  The way I

2     understood your question before --

3          THE COURT:  I asked you if you had any question

4     about the underlying validity of this man's entry of a guilty

5     plea, A, and B, the underlying basis for this prosecution,

6     and you said you had questions about B.  You weren't sure.

7          If you have questions about the underlying basis

8     for this prosecution -- I'm not talking about the motivation

9     for it or anything like that.  I'm talking about the evidence

10    gathered and the methods used to gather it, does it form an

11    evidentiary basis to satisfy the elements of this case to

12    establish a lawful conviction?

13         MS. DEAN:  Oh, yes, your Honor.  I understood the

14    question differently as the motivation for the prosecution so

15    that's why you got my answer.

16         THE COURT:  Okay.  So knowing that I didn't mean

17    that, because that is irrelevant, all right, what is the

18    answer -- well, I don't think the prosecution's motives for

19    prosecuting, unless they are in some way unlawful because

20    they're based on race or gender or something like that, have

21    any bearing.  That's generally the law.

22         So rather than tell me how you understood it

23    before, I'm going to -- again, I promise I'll listen to you

24    as long as you want, but you've got to answer my questions

25    when I make them.

1          The question is:  Do you have any basis to question

2     the lawfulness, the validity of the entry of his guilty plea,

3     or the underlying basis for this prosecution as a matter of

4     the evidentiary satisfaction of the elements or the methods

5     used to gather the evidence?

6          MS. DEAN:  Mr. Musso chooses to plead guilty.  I

7     can't say to this day that I believe there was Comp B in

8     there, but if Mr. Musso chooses to believe that, that is his

9     right.  It is his right to plead guilty here.

10         THE COURT:  Okay.

11         MS. DEAN:  And so -- but if you're asking me,

12    because I'm about to tell you, answer your question directly,

13    I can't just say what's easy.  I have to tell you what I

14    believe.

15         THE COURT:  Fair enough.

16         MS. DEAN:  And so that's what I'm doing.  I'm not

17    trying to sit here all day.  As I told you from the

18    beginning, I've never had a case like this happen where you

19    have person after person swearing to this affidavit, and

20    I don't -- understanding the pains that they would go through

21    if they were telling a story is a problematic thing.

22         In the thing the people so far have all identified

23    Mr. Hunter as being the one who made that statement.  I don't

24    know who made the statement.  I didn't hear it.  I can just

25    tell you what the affidavits say.

1          THE COURT:  I thought he just told me that Mr.

2    Hunter wasn't even working in the U.S. Attorney's Office at

3    the time the statements were made.

4          MS. DEAN:  He was physically in the courtroom on

5    April 17, 2018.  I saw him there.  You can listen to the

6    transcript yourself.  I believe that I saw him there and I

7    believe he was present.

8          THE COURT:  Sure.

9          MS. DEAN:  Unless I'm mistaken, I believe that he

10   was there then.  I think he was talking about the arrest, and

11   I wasn't saying -- most of the interrogation was recorded,

12   and I'm not saying that anybody said anything like that

13   during the interrogation.  I was talking about in the United

14   States courthouse, and that's why I ordered a transcript.

15   There was nothing on the transcript.  It was at the end of

16   the hearing and people were leaving.

17          I was not trying to make anyone's job more

18   difficult here.  I just think in the spirit of the questions

19   for me not to disclose that I thought this was part and

20   parcel, that I don't think it would be right.

21          THE COURT:  Yeah.  I -- you don't think it would be

22   right.  Well, listen, if you think there's a reasonable doubt

23   about whether the prosecution has evidence to prove the four

24   elements of the offense and you are allowing him to enter a

25   guilty plea, you're committing malpractice.

1           By the way, I don't have any reason to believe

2   you're committing malpractice except that now you're saying

3   these things.

4           You sat next to him when he signed an agreement

5   that said that they could prove it beyond a reasonable doubt,

6   and you signed it, too.

7           MS. DEAN:  I signed it --

8           THE COURT:  Never interrupt me.

9           MS. DEAN:  I'm sorry.

10          THE COURT:  Now we're in court and you're talking

11  about ten affidavits that you haven't submitted to the Court,

12  and you're not sure if it was -- it sounds like you made a

13  reference to you're not sure if it was Comp B, which in other

14  words is I assume what would make these explosives firearms,

15  right?

16          So what this seems like to me is a lawyer trying to

17  plant an infirmity into a guilty plea so it becomes a problem

18  later.

19          Now, look, I'm just telling you how it looks.  I'm

20  just telling you how it looks.  We haven't dealt much with

21  each other.  I don't know you.

22          But the bottom line is as a lawyer you've got to

23  satisfy yourself that the evidence can satisfy the elements

24  or it would be malpractice for you to permit him to enter a

25  guilty plea.  Unless he just wanted to plead guilty just to

get it over with, and I wouldn't permit that.  He's got to plead guilty knowing he's guilty.

So I'm not sure what to do with this now, and I don't want to make a big mess for Judge DiClerico whose case this is to unsort, but it sounds like -- you know, all this sounds like is the basis for a 2255 after the fact based on either, A, some type of prosecutorial misconduct that you're talking about, a threat that was allegedly made it sounds like at an arraignment or a detention hearing, or B, your own ineffective assistance of counsel.  That makes me concerned.

I'm just trying to think about how to proceed with these allegations you're making against the prosecutor.  Now, you're saying --

Mr. Hunter, were you there at the arraignment on that date?

MR. DAVIS:  Your Honor, if I could --

THE COURT:  No, no, no, no, no.

Were you there?

MR. HUNTER:  In April of 2018 I was with the office.

THE COURT:  Were you there at the hearing where he was arraigned or whatever this was?

MR. HUNTER:  I thought initially she was talking about Mr. Musso's initial arraignment, and I was not here, nor was I here, I don't believe, when he was arraigned on the

1    superseding indictment.

2              THE COURT:  So what was the hearing on April 18th?

3              MS. DEAN:  It was a bail hearing, your Honor.

4              THE COURT:  Detention hearing, sure.

5              MS. DEAN:  Yes, your Honor.

6              MR. HUNTER:  I would have been there for that.

7              THE COURT:  Okay.  You asked for the transcript.

8    Did the transcript bear out this allegation that he made a

9    threat?

10             MS. DEAN:  No, because it happened -- according to

11   the people who heard it, it happened when Mr. Musso was

12   walking out the door when the people were leaving, and the

13   transcriptionist had stopped the transcription because the

14   Court --

15             THE COURT:  Well, you say no because of that

16   reason.  It also could be no because he never said it, right?

17   That's another possibility; am I right?  Your possibility is

18   right, but obviously you don't know why because you don't

19   know.  None of us know.

20             MS. DEAN:  None of us know, but here's what I --

21   from the affiants, it was after the steno had appeared to

22   quit taking notes.

23             THE COURT:  And would not have captured the

24   statement.

25             MS. DEAN:  Right.  In other words, unless their

1    audio had captured it.  So I specifically asked the steno if
2    there was any audio after the fact and everything.
3            So my understanding is most -- in my experience
4    most stenos -- when the judge starts to leave the room, the
5    steno will quit transcribing unless it's a judge taking a
6    break or something.  So it appeared to me that from the
7    steno's perspective the hearing had concluded.
8            THE COURT:  Yeah, I get it.  It's not complicated.
9    You're saying that she had already stopped typing and
10   recording when the statement was made.  Yeah, I get it.
11           MS. DEAN:  That's what I understand from their
12   affidavits.  Again, I did not hear it.
13           THE COURT:  All right.  You were there?
14           MS. DEAN:  I was there.  Absolutely I was there.
15           THE COURT:  I get it.  You were there.
16           MS. DEAN:  Yeah.  I didn't hear it.
17           THE COURT:  I just want to make sure now though.
18   You're saying in this courtroom that this man right here,
19   this AUSA, threatened your client by saying, what was it, I
20   will bury you?
21           MS. DEAN:  Okay.  I'm not saying that.  I'm saying
22   ten affidavits here and two more -- I'm saying that these
23   people said, hold onto your wallet because they're going to
24   take it all.  Hold onto your wallet because they're going to
25   take it all.  Each one -- there's a couple that have a

1  different --

2            THE COURT:  This man right here?

3            MS. DEAN:  Yes.  That is what these affidavits say.

4  Again, I'm not saying --

5            THE COURT:  Okay.  Now, do you see the problem?

6  Here's my question for you.  You're his counsel.  He's

7  telling me he has not been coerced.  He's telling me he has

8  not been threatened.  He's telling me his will has not been

9  overborne and that he's entering this of his own free will.

10            MS. DEAN:  I understand.

11            THE COURT:  Are you suggesting anything to the

12  contrary?  Because if you're suggesting something to the

13  contrary, me accepting his plea makes no sense.

14            MS. DEAN:  I understand that, but when you asked

15  the question, I think for me not to have answered you knowing

16  what I know would not have been proper.  And he has already

17  told you that he's out of money so he's answered your

18  question.

19            THE COURT:  I'll appoint him a lawyer to represent

20  him, to litigate this so we can get to the answer because,

21  see, the answer can't be he already told you what he thinks.

22  You're his attorney.

23            MS. DEAN:  Yes, your Honor.

24            THE COURT:  Right?  You're his attorney.  If you

25  think his will has been overborne, all right, by some type of

1  threat that you have affiants who will swear to by the

2  prosecutor, that will potentially undermine the validity of

3  his plea because later on -- and I don't mean to cast no

4  aspersions whatsoever, sir, okay, but later on when he comes

5  into some money where perhaps he can retain you to fight this

6  fight, you file a motion to withdraw his guilty plea or to

7  vacate his conviction, and when I say, well, we already

8  decided all of this, you'll stand up and say, Judge, I told

9  you all about this at the plea hearing.

10       Do you understand what I'm saying?  Do you

11  understand why this doesn't work?

12       MS. DEAN:  I understand what you're saying, but

13  here's what I would like to draw your attention to.  What I

14  have signed -- and I examine it.  I have read and explained

15  this 13-page plea agreement to the defendant and he has

16  advised that he understands and accepts the terms, and that's

17  what I signed and that's what I did.  That's truthful.

18       I understand the Court's concern.  I guess I -- and

19  you and I haven't dealt with each other, but that would not

20  be ethical to play the game that you're talking about.

21       THE COURT:  I think the question you have to ask is

22  whether it's ethical to play the game you're playing right

23  now.  That's the question you've got to ask.

24       MS. DEAN:  I don't think I'm playing a game.  I

25  think that to not --

1          THE COURT:  Well, your client just told me -- your

2    client just told me that he wasn't coerced, manipulated, or

3    forced to enter the plea, and you're telling me you question

4    that.

5          MS. DEAN:  I'm saying I think it's a part of it.

6    To think that it's not a part of it -- I don't know if some

7    people can analyze in their own mind is it not enough to make

8    a difference, is it a part.  I don't have that answer.  But

9    again, I don't think to not disclose that would have been

10   proper.

11         Do I think that he is making this choice -- I've

12   said it repeatedly.  I think he's intelligently choosing it.

13   He understands the consequences -- potential consequences

14   because no one knows until sentencing the actual

15   consequences, and he is willing to make that choice.

16         But I think what you're talking about -- a person

17   who is indigent certainly can get appointed counsel, but the

18   standards of indigency, a person has to -- Mr. Musso wouldn't

19   meet those standards of indigency from the way I understand

20   it.

21         THE COURT:  Here's the thing though.  I'm the

22   judge, and if I want him to have new counsel, I can do it.

23         I think you're his counsel of choice.  I think he

24   wants you.

25         MS. DEAN:  Yes.

1          THE COURT:  I want to be respectful of that.
2    That's how it's supposed to work.
3          MS. DEAN:  Right.  And I understand this is a
4    sticky wicket here, and I'm not trying to create a sticky
5    wicket, but having people tell me things like that, and given
6    my duty to the Court of candor and -- the real reason I think
7    judges ask lawyers is because they want the truth.  They want
8    to make sure that --
9          THE COURT:  I know, but I also expect lawyers to,
10   especially experienced ones like you, to be able to say,
11   look, I know this client.  I've dealt with him.  He's
12   competent to enter a plea and this plea is not the product of
13   some type of coercion or prosecutorial misconduct.  And if
14   you think it is, the idea that I'm going to accept his plea
15   is farfetched.
16          Let's take a recess.  I want to talk to counsel.
17          (RECESS)
18          THE COURT:  First things first.  I've just taken a
19   recess and conferred with counsel for a few minutes.  The
20   first thing I want to do is during the plea colloquy, which
21   we're going to suspend and reconvene at a later date, and
22   I'll explain why momentarily, but during that defense counsel
23   made some allegations regarding one of the AUSAs in the case
24   and said she had gathered affidavits, which I assume are
25   going to be turned over to the prosecution if any relief is

1    sought based on them, but I wanted to give the prosecutor a

2    chance to respond.

3              MR. HUNTER:  Thank you, your Honor.

4              Just for the record, I would say I never threatened

5    Mr. Musso or had any discussion with him outside, you know,

6    at all, much less outside the presence of his counsel.

7              THE COURT:  Understood.  All right.

8              Look, I'm going to direct most of my comments to

9    you, Mr. Musso, so you understand what's happening today.

10             I was conducting a colloquy with you.  A colloquy

11   means a conversation on the record.  I was trying to make

12   sure you understood what rights you were giving up by

13   pleading guilty instead of going to trial and how all those

14   rights are connected to the possible penalties, how

15   sentencing is conducted in federal court, how the guidelines

16   work.  I wanted you to have a good understanding of

17   everything, and you already did basically based on most of

18   your conversations with your lawyer, but I had to make sure

19   you understood those things so we could have a record.

20             We were proceeding, but what happened was after we

21   got to a certain point your lawyer raised a few concerns and

22   those concerns mean to me, as the presiding judge, that I

23   really can't accept your guilty plea today.

24             There are three things in particular that were said

25   that are of concern to the Court.  First of all, your

1    attorney made an allegation against the prosecutor that the

2    prosecutor threatened you at your detention hearing and that

3    that amounts to prosecutorial misconduct.  It may or may not,

4    but that's the allegation.  And there might be relief

5    available to you based on that.  There might be something you

6    could gain in the context of this proceeding.

7            Secondly, the question about whether -- when I

8    asked you whether you had been intimidated or forced or

9    coerced in any way, your lawyer raised a possibility that the

10   allegation against the prosecutor threatening you might be

11   operating in your mind at some level as a threat, that you

12   would in some way be prejudiced or in some way harmed by a

13   prosecution by an ill-motivated prosecutor.  In other words,

14   that in some way that affected your decision-making in a way

15   that it should not because your decision-making should be

16   based on the evidence in the case, the likelihood of

17   prevailing at trial, and the consequences after a trial, and

18   in light of all your rights to a jury trial.  That's the

19   correct analysis, and it shouldn't be affected by any threats

20   perceived by you on the part of the law enforcement or

21   prosecuting authorities.

22           And I'm not suggesting for a moment, by the way,

23   that that took place.  It's an allegation that was made.  I

24   make no finding at this point.

25           That's two things.

1          The third thing is that your lawyer stood up and

2     said that she had concerns about whether, I'll put it in my

3     words, that these grenades were actually firearms because

4     there was I guess some molecular compound in them that either

5     made them explosives or not explosives, right?

6          Counsel, have I got it right?

7          MS. DEAN:  I'm saying that because of the weight of

8     them that I'm concerned that they weren't real grenades

9     because they weighed -- according to my scale, they weighed

10    18 ounces, and the government is very consistent with 14

11    ounces.  So my concern is what's in there and what's not in

12    there because real grenades just wouldn't leave Texas at 18

13    ounces.

14         THE COURT:  Okay.  That's something you just told

15    me.  Is that the same issue or the other issue that you

16    mentioned before about that wasn't compound B or something?

17         MS. DEAN:  Compound B is what is in real M67s.  And

18    so my concern -- and I've made this clear from the very

19    beginning so this wasn't a new thing to anyone.

20         THE COURT:  I know.

21         MS. DEAN:  I know you weren't the trial judge, but

22    I'm saying it isn't a surprise to the government because I

23    had actually asked and was allowed to --

24         THE COURT:  Is it the chemical composition of the

25    compound B, or is it that it's not really an explosive

1    compound, or that it weighs too much?  What are you saying?

2              MS. DEAN:  I'm saying because it weighs too much

3    the chance of them being M67s in my opinion is like zip

4    because the government has incredible statistics.  Every

5    little thing is specified in government contracts, and if

6    they are even off -- people who throw these every day, they

7    weigh 14 ounces every day of the week.  For someone who

8    throws one every day if one was 15 ounces, it would throw

9    them off.  So one that weighs one pound two ounces, which is

10   18 ounces, is off the chart.

11             These were made at a firm in Texas.  There's very

12   few places in the country that actually make M67s.  These

13   were made in Texas.  And when there was even a delay timer in

14   them that was incorrect, they pulled massive amounts from the

15   market.  When I say from the market, from the particular

16   military center.

17             So my part, again, was just being truthful.  I'm

18   not saying it couldn't be proven.  I'm saying when you were

19   asking me for my opinion as counsel, the scale that I put

20   them on -- I was not allowed to touch them, the Court allowed

21   us with the FBI to put it on -- is a scale I would bet my

22   life on every day.  When he put every one of them on it, each

23   one of them on it, they all weighed 18 ounces.

24             THE COURT:  Your counsel has said that she

25   questions the sufficiency of the evidence.  That's the way I

1    would characterize it in the shortest possible way.

2          So those three things:  An allegation of

3    prosecutorial misconduct; B, an allegation that the

4    prosecutorial misconduct may have played an improper role in

5    your decision-making and the exercise of your free will in

6    entering a guilty plea, because I have to find that your plea

7    is knowing, voluntary, and intelligent; and third, a question

8    about the sufficiency of the evidence that your attorney

9    made, and she related that before to the availability of

10   resources on your part to look into that issue.

11         Now, it's difficult for me to accept your plea

12   under those circumstances because your plea has got to be

13   knowing, voluntary, and intelligent.

14         Here's what I'm going to do.  First of all, you

15   need to understand something.  You have a right to a jury

16   trial, which we've already been over, and you have a right to

17   enter a guilty plea if that's what you want to do.  These are

18   your rights.  This is your life we're talking about, right?

19   These are your decisions and you have to make them in a way

20   that is fully aware of your rights and fully aware of the

21   evidence that's been gathered against you.

22         These three issues need to be at a minimum worked

23   out between counsel so there's an agreement about how they

24   impact this case, and if not worked out, brought to the

25   attention of the Court so the Court can decide.

1          So I'm going to delay this so those conversations

2     can happen.  I'm going to let counsel schedule with the Court

3     when they want this to take place.  I won't schedule it

4     today.  I'll let you confer and pick a date together.

5          Here's what I would also like to do though, Mr.

6     Musso, and I hope you don't mind.  I would like to appoint

7     you a second attorney, what's called standby counsel.

8          Ms. Dean will still be your counsel because I know

9     she's your counsel of choice.  I assume that's the case,

10    right?  She's your counsel of choice?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Just a second opinion, someone you can

13    talk to, someone she can talk to, right?  That person will be

14    of no charge to you.  I'll appoint -- the Court will appoint

15    a competent, experienced attorney, just like Ms. Dean, who

16    will go over these issues with you, take a look at the

17    situation, and give you advice.  And at least I'll be able to

18    ask the attorney if the attorney has any questions about your

19    competency to enter a plea and whether it's knowing,

20    voluntary and intelligent.

21          Do you understand?

22          THE DEFENDANT:  Yes, I do.

23          THE COURT:  All right.  Because these questions --

24    today you were ready to enter a guilty plea.  Down the

25    road -- and I know you think very highly of Ms. Dean, but you

1   might look at it later and say I wish I hadn't pled guilty

2   with these issues on the table and you might want to come

3   back to court for what we -- remember we talked about that,

4   collateral attack?

5               THE DEFENDANT:  Yes.

6               THE COURT:  I want to eliminate any grounds for

7   that, if we can, by being very careful at each stage of the

8   case.  So I'm not going to take your guilty plea today.  I

9   know it's inconvenient, I apologize for that, but it really

10  is done to protect your rights and to make sure your

11  constitutional rights are being fully honored in this way.

12              It would be very easy for me to say, okay, I'll

13  take your plea, how do you plead, and you would say guilty

14  and it would be over, and I would sign some papers.

15              It's much better to take it slowly and make sure

16  that your plea is knowing, voluntary, and intelligent.  Do

17  you follow me?

18              THE DEFENDANT:  Yes, I do.

19              THE COURT:  All right.  That's what I'm going to

20  do.

21              May I appoint you standby counsel?

22              THE DEFENDANT:  Yes, you may.

23              THE COURT:  I'll do that.  I'll get on that right

24  away.

25              All right.  I apologize to those who have come to

1    support you in the gallery.  I know you're here to support

2    the defendant, I assume you are, and it's not to waste your

3    time, but we've got to be careful in these situations.

4           The most important part of this proceeding is to

5    protect the rights of the defendant.  Although we've got an

6    accusation against an officer of the court, which is also an

7    important issue that needs to be worked out as well.

8           All right.  Is there anything further for the Court

9    from either side?

10          MR. DAVIS:  No, your Honor.

11          I assume the jury trial is off for now in terms of

12   issuance of subpoenas and preparing for trial.  We would ask

13   that until we can resolve this.

14          THE COURT:  Can I get a waiver of speedy trial?

15          MS. DEAN:  I see no reason -- I would ask him.  I

16   don't believe, as I've said before, that Mr. Musso is going

17   to change his mind, but I always want to ask clients about

18   the waiver of speedy trial.

19          THE COURT:  Of course.

20          MS. DEAN:  Can I have a second here?

21          THE COURT:  Sure.

22          (Attorney Dean confers with the defendant)

23          MS. DEAN:  Yes, my client waives speedy trial, your

24   Honor, for this purpose.

25          THE COURT:  That's a speedy trial waiver, and the

1 Court finds under the criteria set forth under the Speedy

2 Trial Act justice requires this continuance to work out these

3 issues.  So it's taken off the -- is it the May trial

4 calendar?  It will be rescheduled when we get these issues

5 resolved.

6          MS. DEAN:  Let me ask you one thing, your Honor.

7 I'm sorry.  One thing.

8          Do you have an idea when you will appoint this

9 counsel?  The record is voluminous in Mr. Musso's case, so I

10 don't know if you -- and let me tell you the reason I'm

11 concerned -- and I'm presuming that this waiver would --

12 prior counsel agreed to a gag order on the videos in this

13 particular case, the surveillance video of Milt Abrams of

14 Charlie Company and all of those, and so therefore I'm

15 presuming because this would be counsel that it would be

16 absolutely normal --

17          THE COURT:  Has there been a gag order entered in

18 this case?

19          MS. DEAN:  Yes, your Honor.

20          THE COURT:  So obviously it's going to apply to any

21 new counsel.

22          MS. DEAN:  Well, what I'm saying is I think the way

23 it's written that I would be allowed to give it to this new

24 counsel, but I just want explicit permission because I'm very

25 careful when there's a gag order not to --

1          THE COURT:  I actually think -- you're right.  I'm

2     going to let new counsel determine what records new counsel

3     needs to examine.

4          At a minimum, I'm going to order the transcript of

5     this proceeding to be prepared so new counsel can read that

6     because I think that's really the most important one, but he

7     can also confer with you -- he or she can also confer with

8     you, and of course your client, and if there's more that you

9     think counsel ought to review, you ought to recommend it.

10          MS. DEAN:  Yes.  And one more thing.  I didn't

11     think of it at trial, but I can think of -- would my client

12     have a right of, not being unreasonable, but first refusal?

13     Let's say the particular counsel you appoint for my client

14     wouldn't be to his liking for some reason, that he would --

15     again, we're not talking about abusing the privilege and

16     trying to delay things and refusing four, five, six counsel.

17     We're just talking one time if for some reason my client were

18     to feel that that counsel is not satisfactory?

19          THE COURT:  Am I going to provide a right to first

20     refusal?  No.  Am I going to have a conversation with you off

21     the record here after we're done so you can apprise me of any

22     potential problems?  Yes.

23          MS. DEAN:  I just thought of that.  I was just

24     trying to think through the mechanics so that everything went

25     smoothly.

1          THE COURT:  Thanks.  Anything else for the Court?

2          MR. DAVIS:  Not from the government, your Honor.

3          THE COURT:  All right.

4          Counsel approach the sidebar.  We're off the

5     record.

6          (OFF THE RECORD)

7          THE COURT:  We're adjourned.

8          (Conclusion of hearing at 4:03 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

     I, Susan M. Bateman, do hereby certify that the
foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


Submitted: 5-2-19                    _Susan M. Bateman_
                              **SUSAN M. BATEMAN, LCR, RPR, CRR**
                              LICENSED COURT REPORTER, NO. 34
                              STATE OF NEW HAMPSHIRE