UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:16-cr-33-JL |
| ) | |
| DANIEL MUSSO ) | |
| _____) | |

GOVERNMENT'S SENTENCING MEMORANDUM,
MOTION FOR UPWARD DEPARTURE, AND
OBJECTION TO DEFENDANT'S MOTION FOR A DOWNWARD VARIANCE

The United States of America objects to the defendant's sentencing memorandum and request for a variance and respectfully requests that the Court apply an upward departure and impose a guideline sentence of 70 months' imprisonment.

**I.   The Defendant Committed Perjury At Trial And Should Be Assessed The Two-Level Enhancement For Obstruction Of Justice.**

The PSR correctly calculates Musso's base offense level under section 2K2.1 as 18 and correctly applies enhancements for the number of firearms and because the offense involved a destructive device. PSR ¶¶ 34–36. The PSR erred in not applying the obstruction of justice enhancement. PSR ¶¶ 28, 39.[1]

The defendant testified at length in his own defense at trial, and denied that he "knowingly" received the grenades in this case. In the PSR, the probation officer noted that it is "reasonable to infer that the defendant committed perjury, and, therefore, obstructed justice in this case." PSR ¶ 28. However, the probation officer deferred the matter to this Court, since it presided over the trial and heard the defendant's testimony. PSR ¶ 28. In the offense level

---

[1] The government agrees that the Court should not consider the defendant's withdrawn guilty plea as evidence against him. *See* Fed. R. Evid. 410; Fed. R. Crim. P. 11(f). The government also has no objection to editing the PSR such that, when quoting the video and audio recordings, the PSR quotes the agreed-upon transcripts. *See* ECF No. 173 at 4 n.1.

1

computation, the probation officer did not apply the obstruction of justice enhancement. PSR ¶ 39. The government now objects to the PSR's failure to include that enhancement.

The Sentencing Guidelines provide that if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . prosecution . . . of the instant offense of conviction," and "the obstructive conduct related to . . . the defendant's offense of conviction," a two-level enhancement is warranted. U.S.S.G. § 3C1.1. The guideline squarely applies to "committing . . . perjury." *Id.*, comment. (n.4(B)). Nonetheless, in applying the obstruction of justice guideline to alleged false testimony by a defendant, "the court should be cognizant that inaccurate testimony . . . sometimes may result from confusion, mistake, or faulty memory," and therefore "not all inaccurate testimony . . . necessarily reflect[s] a willful attempt to obstruct justice." *Id.*, comment. (n.2). Therefore, to impose the enhancement a sentencing court must make factual findings that encompass all the elements of perjury – falsity, materiality, and willfulness. *United States v. Mendoza-Maisonet*, 962 F.3d 1, 21 (1st Cir. 2020). A single finding of perjury is sufficient to warrant the enhancement. *United States v. Nagell*, 911 F.3d 23, 30 (1st Cir. 2018).

During the trial the defendant testified that he intended to buy "smoke" grenades, which he believed could be legally purchased, and never wanted to buy fragmentary hand grenades. This was the core of his defense: he lacked criminal intent. The defendant explained that he wanted smoke grenades for protection; during a home invasion, he said, smoke grenades would allow him to "get out of the home safely" because the intruders could not see. He described buying smoke grenades as a "homeland security measure of a good citizen." The defendant was adamant that because he thought he was buying non-lethal smoke grenades, he "did not think I was going into an illegal transaction at all."

But as the trial evidence overwhelmingly showed, and the jury *necessarily* found, the defendant's repeated and unequivocal claim that he meant to buy smoke grenades constituted perjury. The following facts amply support that conclusion:

- At no time between July 2015 and January 2016 did Musso refer to wanting "smoke" grenades;

- Musso's initial list of desired weapons, submitted to the gun store owner in July 2015, identified "grenades" along with other deadly military hardware, including "C4" and "rockets" (PSR ¶ 11);

- On November 8, 2015, Musso directed the gun store owner to limit their communications via cell phone, email, and text messages (PSR ¶ 12);

- On December 12, 2015, Musso stated to the gun store owner that he wanted "hand grenades" that you "throw" (PSR ¶ 13);

- At his January 22, 2016 meeting with the undercover FBI agent, Musso viewed color photos of the M67 military fragmentation grenades he was purchasing, and was told, "Those are frags" (PSR ¶ 16);

- At the same meeting, Musso agreed that a price of $200 per grenade was fair, because "where else do you buy something like that?" (PSR ¶ 17);

- Also at that meeting, Musso inquired about buying rockets and C-4, explained that he wanted the grenades because he was part of a group that was preparing to protect the country and that the munitions were all going to be hidden, and said that he understood that the undercover agent did not want to be driving around with the grenades because they were illegal (PSR ¶¶ 19-21);

- At the transaction at the Seabrook rest stop on January 27, 2016, Musso again asked about prices for C-4 plastic explosives and a shoulder-fired rocket, was visibly nervous, and repeatedly indicated that he wanted to complete the deal as quickly as possible (PSR ¶¶ 23-24);

- Also at the transaction, Musso viewed the grenades he was buying, which were labelled "hand," "frag," and "grenade"; understood that they were to be thrown, that you pull the pin and can hold the handle as long as you want, that once you release the handle you have three seconds, and that the grenades went "boom" and had a radius of 40-60 feet so "you better be quick"; confirmed that there would be future cash deals at the same meeting place; and vowed that they would "take our country back" and it was "just a matter of materiel" (PSR ¶ 24);

- In his post-arrest statement to the agents on January 27, 2016, Musso never said he meant to buy "smoke" grenades, and instead said that he "didn't care what I got" and

that he "might have" asked for a real grenade; that the undercover agent did not show him pictures of what he bought, or if he did he didn't remember; that he thought the grenades he bought were "fake," like the fake plastic one he had in his shop that was empty and rattled; that he lied to the undercover agent about being part of a group in order to get a discounted price; that he had spoken to his son David about buying grenades and his son told him it was "highly illegal"; and that he "wanted a hand grenade to have in the house, just in case some terrorists come in . . . and start attacking."

In short, the trial evidence was consistent with Musso's intent to buy illegal military fragmentation grenades, and with his knowledge that what he was doing was criminal. His elaborate story that all along he meant to buy harmless "smoke grenades" was contrived long after the fact, as part of a desperate effort to explain away the damning videotaped evidence. And so the defendant, under oath, told the jury his tale: that although he was buying enough high-powered ammo to fill an armory, he also was intensely interested in acquiring a harmless novelty item now featured at "gender reveal" parties; that he was being framed by his son's friend for no reason; that while the camera rolled he somehow never said what he actually wanted, and instead referred to "hand grenades" and a meeting with the "Army buddy"; that in his two sessions with the undercover agent he pretended to be someone he wasn't, namely a member of a group preparing for combat against the government, all to get a price discount; and that after the arrest, instead of quickly straightening out the misunderstanding, he said he thought the grenades were "fake," and wanted them for protection against terrorists.

This testimony was patently false, because it was directly contradicted by the defendant's own statements, because it was belied by a "solid foundation of circumstantial evidence," *Nagell*, 911 F.3d at 30, and because the jury, in finding (after brief deliberations) beyond a reasonable doubt that Musso knowingly received real grenades, necessarily concluded it was false. *See United States v. Villarman-Oviedo*, 325 F.3d 1, 16 (1st Cir. 2003) (noting that jury must have determined that defendant's testimony was false, stemming from his desire "to convince the jury

4

of a fabricated theory to excuse himself from liability"). The testimony was "material" because it went to the heart of the defendant's *mens rea* defense, and "if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, comment. (n.6). And it was willful because willfulness can be inferred from sufficient materiality. *Nagell*, 911 F.3d at 30. This was not a case of "confusion, mistake, or faulty memory," in that the defendant never wavered from his "smoke grenade" fabrication, so the willfulness of his falsehood cannot reasonably be questioned. *See United States v. Mercer*, 834 F.3d 39, 49 (1st Cir. 2016).

In short, the defendant's sustained claim that he meant to buy smoke grenades was a "central and deliberate" falsehood and a clear instance of perjury. *Mendoza-Maisonet*, 952 F.3d at 22. Accordingly, this Court, after making the appropriate findings, should apply the two-level enhancement for obstruction of justice.

Thus, Musso's offense level before any departure or variance is 24 resulting in a guideline range of 57 to 71 months' imprisonment.

## II. An Upward Departure Is Warranted Because The Offense Involved Multiple National Firearms Act Weapons And, Separately, Because Of The Type Of Destructive Device Involved In The Offense.

The application notes to section 2K2.1 provide two separate bases for upward departures that are applicable here. First, an upward departure is warranted where "the offense involved multiple National Firearms Act weapons (e.g., machineguns, destructive devices)." U.S.S.G. § 2K2.1, comment (n.11). Separately, an upward departure is warranted where "the cumulative result of the increased base offense level and the enhancement under subsection (b)(3)"—the enhancement for an offense that involves a destructive device—"does not adequately capture the seriousness of the offense because of the type of destructive device involved, the risk to the public welfare, or the risk of death or serious bodily injury that the destructive device created." U.S.S.G. § 2K2.1, comment (n.7).

The offense here both involved multiple NFA weapons—four explosive grenades—and involved destructive devices that were particularly dangerous such that the general destructive device enhancement "does not adequately capture the seriousness of the offense because of the type of destructive device involved." U.S.S.G. § 2K2.1, comment (nn.7, 11).

As Mr. McCrady testified at trial, the M67 fragmentation grenade is designed for one purpose: to kill people. It has a killing radius five meters and a casualty radius of fifteen meters. Fragments can disperse as far as 230 meters. Both Mr. McCrady and Mr. Parrott testified that with our without a working fuze, the grenades could explode either by sufficient impact or sufficient heat—if, for example they were in a burning building. The defendant ordered six of these weapons and received four of them. Each was an NFA weapon and a particularly dangerous type of destructive device. *See United States v. Musso*, 914 F.3d 26, 31 (1st Cir. 2019).

At the very least, "an upward departure is warranted because [Musso's] offense involved several especially dangerous National Firearms Act weapons." *United States v. Brunet*, 178 F. Supp. 2d 342, 345 (S.D.N.Y. 2001), *aff'd*, 275 F.3d 215 (2d Cir. 2001).[2] The language in the guidelines is plain and unambiguous. The NFA weapons Musso purchased were not sawed off shotguns, rifles or silencers,[3] but were military fragmentation grenades. As one court observed in applying this upward departure, "[t]he grenade is especially dangerous because its blast is 'omnidirectional and therefore indiscriminate in its targets.'" *Brunet*, 178 F. Supp. 2d at 344–45 (applying one-point upward departure for multiple NFA weapons where offense involved

---

[2] The Second Circuit "affirm[ed] the district court's upward departures under [the] Application Notes . . . of U.S.S.G. § 2K2.1 for the reasons stated in its published opinion." *United States v. Brunet*, 275 F.3d 215, 216 (2d Cir. 2001).

[3] 26 USC § 5845(a)(1), (3), (7).

6

machine guns, an assault rifle, and one M-1 hand grenade). This consideration alone warrants a one-point upward departure.

In addition, an upward departure is warranted because the destructive device enhancement "under subsection (b)(3) does not adequately capture the seriousness of the offense because of the type of destructive device involved." U.S.S.G. § 2K2.1, comment (n.7). Subsection (b)(3) provides a 15-level enhancement for "a destructive device that is a portable rocket, a missile, or a device for use in launching a portable rocket or a missile" and a 2-level enhancement for any other destructive device. U.S.S.G. § 2K2.1(b)(3). Destructive devices can range from homemade bombs and Molotov cocktails, *see* 26 U.S.C. § 5845(f)(3),[4] to military munitions such as missiles, rockets and fragmentation grenades, *see* § 5845(f)(1).[5] As one court put it, "[t]he statute does not require that a device be highly destructive in order to be classified as a destructive device." *United States v. Hammond*, 371 F.3d 776, 781 n.3 (11th Cir. 2004) (citing *United States v. Markley*, 567 F.2d 523, 526 (1st Cir. 1977)). Yet all destructive devices (other than rockets or missiles)—highly destructive or not—are subject to the same 2-point enhancement. An explosive military munition like a fragmentation grenade is highly destructive and creates a greater risk of harm than other types of destructive devices. The Sentencing Commission recognized the substantial gap between these two enhancements noting that offenses involving destructive devices "cover a wide range of offense conduct and involve different degrees of risk to the public welfare depending on the type of destructive device involved and the location or manner in which that destructive device was possessed or transported." U.S.S.G. § 2K2.1, comment (n.7). Thus, the Court may depart upward where the

---

[4] *United States v. Markley*, 567 F.2d 523, 528 (1st Cir. 1977); *United States v. Sheehan*, 838 F.3d 109 (2d Cir. 2016).

[5] *See also United States v. Musso*, 914 F.3d 26, 28–29 (1st Cir. 2019).

destructive device enhancement "under subsection (b)(3) does not adequately capture the seriousness of the offense because of the type of destructive device involved," which created a risk of harm to the general public. *Id.*[6]

Musso purchased four highly dangerous fragmentation grenades in a public rest stop. In fact, he suggested the purchase occur at the Sam's Club parking lot—which would have created an even greater risk to the public. Despite the danger Musso created by purchasing these weapons, because he was promptly apprehended and did not have an opportunity to use or store the grenades in a way would have entailed an even greater risk that others would be harmed, only a one-point enhancement is warranted here.[7]

These two upward departures bring Musso's offense level to 26, resulting in a guideline range of 70 to 87 months.

### III. A Below Guideline Sentence Is Not Appropriate.

The defendant argues that the Court should impose a downward variance to a sentence of time-served, or about 29 months. The defendant's arguments rely on factors that are generally irrelevant to sentencing and his proposed substantial variance is not sufficient to address the seriousness of the defendant's conduct or promote respect for the law.

The defendant first argues that a variance is appropriate because "if he had not been drinking to excess in the time period before his arrest, this whole episode would not have

---

[6] *Cf. United States v. Flores*, 729 F.3d 910, 917 (9th Cir. 2013) ("[I]f the district court determines that the danger of the 40–mm cartridges involved in this case merits a higher sentence than one within the guidelines range with only a two-level enhancement under § 2K2.1(b)(3)(B), the district court may depart or vary upward."). *But cf. United States v. Reichard*, 151 F. App'x 200, 205 (3d Cir. 2005) ("[T]he fact that the device was dangerous, in and of itself, does not justify departure because the dangerousness of the device was already accounted for by the two-level enhancement for use of a 'destructive device.' But the factor nonetheless informs the analysis of the creation of a risk of harm for the general public.").

[7] *See Reichard*, 151 F. App'x at 205 (Four-level upward departure was appropriate where defendant mailed homemade bomb to ex-girlfriend's current boyfriend).

8

happened." ECF No. 173 at 5. Even if the defendant could substantiate this speculation, it would not warrant a variance. Though his motion is styled as a variance, "the policy statements" regarding departures—including those concerning alcohol dependence—"remain relevant to the determination of a reasonable sentence." *United States v. Hodge*, 469 F.3d 749, 757 (8th Cir. 2006) (district court "abused its discretion in failing to consider the policy statement concerning drug addiction" when imposing a downward variance); *see also United States v. Engle*, 592 F.3d 495, 501–04 (4th Cir. 2010) (vacating variant sentence and remanding for re-sentencing due to "the district court's failure to consider the relevant policy statements issued by the Sentencing Commission"); 18 U.S.C. § 3553(a)(5) ("The court, in determining the particular sentence to be imposed, shall consider . . . any pertinent policy statement . . . issued by the Sentencing Commission . . . .").

In applying the policy statement pertinent here—found in section 5H1.4—the First Circuit held that "[d]rug dependence or alcohol abuse is not a reason for imposing a sentence below the guidelines." *United States v. Citro*, 938 F.2d 1431, 1440 (1st Cir. 1991) (quoting U.S.S.G. § 5H1.4); *accord Hodge*, 469 F.3d at 757; *United States v. Page*, 922 F.2d 534, 535 (9th Cir.1991) (per curiam) ("The district court had no discretion to depart downward based on appellant's alcoholism, irrespective of its extreme nature.").[8] And, in issuing this policy statement, the Sentencing Commission rejected the sort of argument the defendant makes here because "[s]ubstance abuse is highly correlated to an increased propensity to commit crime." U.S.S.G. § 5H1.4. Thus, the guidelines "foreclose[e]" a departure based on a defendant's

---

[8] The Ninth Circuit has later held that post-Booker this guideline is advisory, and thus does not preclude the court from considering drug addiction when evaluating the statutory sentencing factors. *United States v. Garcia*, 497 F.3d 964, 971 (9th Cir. 2007).

alcohol dependence and instead instruct that "the problem be addressed through requiring . . . treatment during the supervised release portion of the sentence." *Citro*, 938 F.2d at 1440; *see also* U.S.S.G. § 5H1.4 ("[I]t is highly recommended that a defendant who is incarcerated also be sentenced to supervised release with a requirement that the defendant participate in an appropriate substance abuse program.").

The defendant's crime is not one that arose out of or was motivated by drunkenness or addiction. The undercover recordings speak for themselves: the defendant was careful and he was calculated. He knew what he was doing, what the consequences were, and that everything needed to be "hidden," "undercover" and "undetectable." GX204B. Musso had "been looking for a source for a while" and then engaged in a calculated bargain to obtain weapons he thought he needed to defend himself against the federal government and "to take our country back." GX 204B, 205C. Put simply, the defendant's will was not overpowered by addiction. His past alcohol consumption does not warrant a downward variance. *Hodge*, 469 F.3d at 757 (reversing downward variance based on drug addiction where defendant's "drug addiction may have motivated his participation in the conspiracy, but he was more than a mere user").

Next the defendant argues that a variance to time served is appropriate because (i) he is a changed man, and (ii) he has already served 29 months and might have received a time-served sentence had his April 2019 guilty plea gone through . ECF No. 173 at 4–8. These arguments fail.

The defendant's willingness to take the stand and lie to the jury and this court during trial belies any assertion that Mr. Musso is somehow remorseful and has learned his lesson. As the Court rightly noted at the post-trial detention hearing, Musso's trial testimony was "troubling" and demonstrated a lack of respect for the Court and our system of justice. While he may not be

drinking anymore, despite a significant term of pre-trial detention Musso continues to show a lack of remorse and is unwilling to take responsibility for his actions. Indeed, the defendant is now sober and has completed programs while incarcerated to aid his rehabilitation. Yet he chose to take the stand and testify falsely to avoid responsibility for his crimes.[9] *See United States v. Kolla*, 819 F. App'x 739, 740 (11th Cir. 2020) ("[A] finding that the defendant lacked remorse and testified falsely is a valid basis for an *upward* variance." (emphasis added, citations omitted)). Put simply, Musso demonstrated during the trial that while he may have stopped drinking, he is not a changed man.

And, the defendant will not suffer injustice by not getting the benefit of the April 2019 plea bargain. After the April 2019 plea hearing, Musso fired his attorney and was represented by highly competent court-appointed counsel. On February 25, 2020, the government made the same plea offer to the defendant's new counsel. On March 10, 2020, defense counsel advised the government that he met with Mr. Musso regarding the plea offer and "he does not accept." Whatever issues Musso's prior counsel injected into the April 2019 plea hearing, after Musso fired that attorney he was given another chance. The government made the same offer and Musso reviewed the government's offer with his new counsel. He then chose to forfeit any credit for acceptance of responsibility, go to trial, and lie to the jury. Whatever sentence he may have received had the April 2019 plea gone through is simply not relevant to sentencing.[10]

---

[9] This demonstrated contempt for the judicial process and willingness to lie under oath *after* he has stopped drinking undermines any argument that Musso's prior alcohol consumption somehow mitigates his criminal conduct.

[10] Had the April 2019 plea gone through, Musso's offense level would have been 19, as he would get credit for acceptance of responsibility, would not have perjured himself, and the government would have agreed not to seek an upward departure. *See* ECF No 110 (Plea Agreement); PSR ¶¶ 34–44. This results in a guideline range of 33 to 41 months. Because of the offense conduct in this case, even after a plea, the government would have recommended a sentence in the middle or top of the guideline range.

Finally, the defendant argues that a variance is warranted because of his work history and because, as a convicted felon, he will not be able to own or use guns. ECF No. 173 at 7–9. Again, the Court should consider any pertinent policy statements when considering a variance on these bases. 18 U.S.C. § 3553(a)(5); *Hodge*, 469 F.3d at 757. "Employment record is not ordinarily relevant in determining whether a sentence should be outside the guidelines." *United States v. Rushby*, 936 F.2d 41, 43 (1st Cir. 1991); *see also* U.S.S.G. § 5H1.5. Applying this guidance, the First Circuit has held that a defendant's steady and successful employment, his strong family ties, and his two and one-half years of successful treatment for drug and alcohol abuse were not so extraordinary as to justify a downward departure. *Rushby*, 936 F.2d at 43; *accord United States v. Mogel*, 956 F.2d 1555, 1564 (11th Cir. 1992) ("Ownership of a business, however, much like ownership of a home or of a car, represents an indicator of socioeconomic status, and, as such, is irrelevant for sentencing purposes."). Many defendants have jobs, many do not. Some are driven to commit crimes because they see no other way to support themselves. Others commit crimes despite having steady employment and a supporting family. Indeed, the defendant was a self-employed mechanic and grandfather in 2016 yet he still chose to commit these crimes. His continued self-employment does not indicate a change of heart. While it is laudable that the defendant has a job, there is nothing extraordinary about his self-employment that merits a below-guideline sentence.[11]

---

[11] The cases cited by the defendant prove the point. The defendant in each case—*United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) and *Gall v. United States*, 552 U.S. 38 (2007)—accepted responsibility and pleaded guilty. They did not perjure themselves at trial. In fact, in *Gall*, the court explained that a sentencing reduction was warranted because the defendant's post-offense conduct—including withdrawing from the criminal conspiracy years before indictment and securing steady employment—"was not motivated by a desire to please the Court or any other governmental agency, but was the pre-Indictment product of the Defendant's own desire to lead a better life." *Gall*, 552 U.S. at 44–45. In contrast to the genuine contrition demonstrated by the defendant in *Gall*, Musso has demonstrated a lack of remorse going so far as to perjure himself to escape the consequences of his actions.

Regarding the defendant's inability to own or use a gun: this is true of all felons. The defendant's being restricted from engaging in a hobby—hunting and shooting—is simply no substitute for punishment of this serious offense. *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 445–47 (10th Cir. 2015) (district court committed procedural error in granting downward variance because defendant "had been adequately punished by collateral consequences" of his prosecution and conviction). For example, in *United States v. Bistline*, 665 F.3d 758, 765 (6th Cir. 2012), the district court imposed a downward variant sentence in part because "the consequences of the guilty plea and conviction, which include registration as a sexual offender with the State of Ohio and the publication of that registration to the community and to his friends and neighbors . . . reflect[ ] the seriousness of the offense." *Id.* The Sixth Circuit held that the sentence was substantively unreasonable, explaining:

> [Section] 3553(a)(2)(A) plainly states that "the sentence imposed" should "reflect the seriousness of the offense," (emphasis added); and none of these things are [the defendant's] sentence. Nor are they consequences of his sentence, as opposed to consequences of his prosecution and conviction. The district court's recitation of these collateral consequences therefore does nothing to show that [the defendant's] sentence reflects the seriousness of his offense.

*Id.*

Unlike the defendants in these cases and in *Pauley* (the case cited by the defendant), Musso is not losing his livelihood. Like any felon he can no longer own a gun. This consequence is particularly just and reasonable here: the defendant sought and purchased military munitions to arm himself against the federal government. It does not warrant a downward variance.

### IV. A Guideline Sentence of 70 months' imprisonment is appropriate.

In July 2015, Musso came into a gun store with a list of high powered ammunition and illegal weapons—including C4, Rockets, and Grenades. Over the ensuing months, Musso

13

arranged to meet with an illegal arms dealer and negotiated a deal for four military fragmentation grenades and arranged for future purchases of other military weapons, including rockets and C-4. At trial, Musso took the stand and lied under oath. A substantial sentence is necessary "to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). As discussed already, the defendant's characteristics do not warrant a below-guidelines sentence. Quite the contrary. A sentence of 70 months' imprisonment is necessary to address Musso's offense conduct and conduct at trial and is sufficient but not greater than necessary to satisfy the statutory sentencing factors.[12]

## CONCLUSION

For these reasons, the Government objects to the defendant's memorandum and request for a variant sentence, and respectfully asks that the Court impose a guideline sentence of 70 months' imprisonment.

Dated: October 7, 2020

Respectfully submitted,

Scott W. Murray
United States Attorney

By: /s/ Matthew T. Hunter
Matthew T. Hunter
John S. Davis
Assistant U.S. Attorneys
United States Attorney's Office
53 Pleasant Street, 4th Floor
Concord, NH 03301
603.230.2573
Matthew.Hunter@usdoj.gov
John.Davis8@usdoj.gov

---

[12] With or without an upward departure, a sentence of 70 months is within the guideline range and is appropriate here.